Filed 8/28/17 (reposted to provide complete concurring & dissenting opinion)

# IN THE SUPREME COURT OF CALIFORNIA

CALIFORNIA CANNABIS COALITION )
et al., )
　　　　　　　　　　　　　　　　　　 )
　　　　　Plaintiffs and Appellants, )
　　　　　　　　　　　　　　　　　　 )　　　　　　　　S234148
　　　　　v. )
　　　　　　　　　　　　　　　　　　 )　　　　Ct.App. 4/2 E063664
CITY OF UPLAND et al., )
　　　　　　　　　　　　　　　　　　 )　　　　San Bernardino County
　　　　　Defendants and Respondents. )　　Super. Ct. No. CIVDS1503985
_____ )

　　　　　Here we consider the interplay of two constitutional provisions.  First, sections 8 and 11 of article II of the state Constitution contain the people's initiative power, which we have described as " 'one of the most precious rights of our democratic process.' "  (*Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 591 (*Associated Home Builders*); Cal. Const., art. II (article II), §§ 8 [statewide power], 11 [local power].)  Second, article XIII C — added by one of several successful initiative constitutional amendments concerning taxation — limits the ability of "local governments . . . to impose, extend, or increase any general tax."  (Cal. Const., art. XIII C (article XIII C), added by initiative, Gen. Elec. (Nov. 5, 1996), commonly known as Prop. 218; *Greene v. Marin County Flood Control & Water Conservation Dist.* (2010) 49 Cal.4th 277, 284-285 (*Greene*) [summarizing the purpose of Prop. 218].)

SEE CONCURRING AND DISSENTING OPINION.

The question before us is whether article XIII C also restricts the ability of *voters* to impose taxes via initiative. The Court of Appeal here concluded that article XIII C does not constrain voters' constitutional power to propose and adopt initiatives, and that under article II, section 11 and Elections Code section 9214,[1] the initiative at issue should be submitted to the voters at a special election, not at a general election, as article XIII C would require. In light of the text and other indicia of the purpose associated with the relevant constitutional and statutory provisions, we agree with the Court of Appeal that article XIII C does not limit voters' "power to raise taxes by statutory initiative." (*Kennedy Wholesale, Inc. v. State Bd. of Equalization* (1991) 53 Cal.3d 245, 251 [reaching the same conclusion with regard to article XIII A of the state Constitution] (*Kennedy Wholesale*).) A contrary conclusion would require an unreasonably broad construction of the term "local government" at the expense of the people's constitutional right to direct democracy, undermining our longstanding and consistent view that courts should protect and liberally construe it. (E.g., *Associated Home Builders*, *supra*, 18 Cal.3d at p. 591.) As Ulysses once tied himself to the mast so he could resist the Sirens' tempting song (Homer, The Odyssey, Book XII), voters too can conceivably make the clear and important choice to bind themselves by making it more difficult to enact initiatives in the future. The electorate made no such clear choice to tie itself to the mast here. Without a direct reference in the text of a provision — or a similarly clear, unambiguous indication that it was within the ambit of a provision's purpose to constrain the people's initiative power — we will not construe a provision as imposing such a limitation. (See *Kennedy Wholesale*, at p. 252.) We therefore affirm the Court of Appeal's judgment.

---

[1] Subsequent unlabeled statutory references are to the Elections Code.

2

**I.**

The California Cannabis Coalition is a nonprofit corporation that drafted the medical marijuana initiative at issue here in 2014.[2]  The initiative proposed to repeal an existing City of Upland (City) ordinance banning medical marijuana dispensaries; to adopt regulations permitting and establishing standards for the operation of up to three dispensaries within the City; and to require that each dispensary pay the City an "annual Licensing and Inspection fee" in the amount of $75,000.

In September 2014, initiative proponents Nicole De La Rosa and James Velez[3] filed a notice of their intent to circulate the initiative petition (§ 9202), and the city attorney prepared a ballot title and summary (§ 9203).  The petition plaintiffs circulated included a request that the initiative be considered by voters at a special election.  At least 15 percent of the City's registered voters signed the petition, meeting the statutory threshold for triggering consideration of the initiative (§ 9214), and the City accepted a certificate of sufficiency from the San Bernardino County Registrar of Voters on February 9, 2015.  At that point, section 9214 obliged the City to either (1) adopt the initiative without alteration; (2) immediately order a special election; or (3) order an agency report and, once the report was presented, adopt the initiative or order a special election. (*Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1033 (*Tuolumne Jobs*); see §§ 1405 [time for special election], 9212 [referral to city agency for report].)  The City elected to order an agency report.

Various city departments thereafter prepared a joint agency report.  Among other things, the report concluded that the $75,000 "fee" for the initiative would

---

[2]    We base this discussion of the facts on the Court of Appeal's opinion.

[3]    We refer to De La Rosa, Velez, and the California Cannabis Coalition collectively as "plaintiffs."

3

exceed the costs incurred from issuing a license to and conducting annual inspections of the dispensaries. The report estimated actual costs to be slightly more than $15,000 and found the excess amount of the fee to constitute a general tax. As such, the report determined that the initiative could not be voted on during a special election as required by section 9214, but rather, under article XIII C, section 2, had to be submitted to the voters at the next general election.[4] On March 9, 2015, the city council received the agency report and adopted a resolution consistent with the report's conclusions. The city council also provided notice and direction for submitting the initiative to the voters on November 8, 2016, the next general election.

Plaintiffs then filed a petition for writ of mandate in superior court. They alleged that the City violated section 9214 by failing to submit the initiative to the voters at a special election.[5] They also argued that article XIII C, section 2 did not apply because the $75,000 charge proposed by the initiative was not a tax, nor was it imposed by local government. The court denied the writ petition, determining that the charge constituted a tax and had to be placed on the next general election ballot. The court, however, did not specifically address whether article XIII C, section 2 applies to taxes imposed by voter initiative.

Plaintiffs appealed, and the Court of Appeal reversed. The court held that article XIII C, section 2 only governs levies that are imposed by local government

---

[4]     Article XIII C, section 2, subdivision (b) prohibits a local government from imposing a general tax unless the tax is first submitted to and approved by the voters at an election "consolidated with a regularly scheduled general election for members of the governing body of the local government."

[5]     Plaintiffs also alleged that the City's true motivation in declaring the charge a general tax was its opposition to medical marijuana dispensaries.

4

and, therefore, it does not apply to the voter initiative at issue here.[6] Moreover, the court noted that the people's initiative power must be protected and construed liberally, with doubts resolved in favor of its exercise whenever possible. (E.g., *Rossi v. Brown* (1995) 9 Cal.4th 688, 695 (*Rossi*); *Associated Home Builders*, *supra*, 18 Cal.3d at p. 591.) The court determined that neither the text nor the history of article XIII C contains any evidence that the enactors' intended purpose included constraining future voters' ability to raise taxes via statutory initiative. The court accordingly directed the superior court to issue a writ of mandate compelling the City to place the initiative on a special ballot in accordance with section 9214.

We granted the City's petition for review on June 29, 2016. On November 8, 2016, the initiative at issue was submitted to the voters and defeated, with 64.38 percent voting no.[7] While the case is thus technically moot, it nonetheless presents important questions of continuing public interest that may evade review. (*Peterson v. City of San Diego* (1983) 34 Cal.3d 225, 227.) We therefore exercise our discretion to retain the matter and address the issues.[8] (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1120, fn. 5.)

## II.

We apply similar principles when construing constitutional provisions and statutes, including those enacted through voter initiative. (*Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44

---

[6]     In light of its holding, the Court of Appeal did not address whether the $75,000 charge is a fee.

[7]     (San Bernardino County Registrar of Voters, Elections Office, City of Upland, Measure U <http://www.sbcounty.gov/rov/elections/Results/20161108/> [as of Aug. 28, 2017].)

[8]     Moreover, we note that neither party has sought dismissal on mootness grounds.

5

Cal.4th 431, 444.)  Our primary concern is giving effect to the intended purpose of the provisions at issue.  (*Id.* at p. 448 [explaining that we construe provisions "in a manner that effectuates the [enactors'] purpose in adopting the law"].)  In doing so, we first analyze provisions' text in their relevant context, which is typically the best and most reliable indicator of purpose.  (*Larkin v. Workers' Comp. Appeals Bd.* (2015) 62 Cal.4th 152, 157; *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 321 [when interpreting voter initiatives, " 'we begin with the text' "].)  We start by ascribing to words their ordinary meaning, while taking account of related provisions and the structure of the relevant statutory and constitutional scheme.  (*Los Angeles County Bd. of Supervisors v. Superior Court* (2016) 39 Cal.5th 282, 293; *Bighorn-Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205, 212 (*Bighorn*).)  If the provisions' intended purpose nonetheless remains opaque, we may consider extrinsic sources, such as an initiative's ballot materials.  (*Larkin*, at p. 158.)  Moreover, when construing initiatives, we generally presume electors are aware of existing law.  (*In re Lance W.* (1985) 37 Cal.3d 873, 890, fn. 11 (*Lance W.*).)  Finally, we apply independent judgment when construing constitutional and statutory provisions.  (*Western States Petroleum Assn. v. Board of Equalization* (2013) 57 Cal.4th 401, 416.)

A.

The people's initiative power is contained in article II, sections 8 and 11.  The former section provides, "The initiative is the power of the electors to propose statutes and amendments to the Constitution and to adopt or reject them."  (Art. II, § 8, subd. (a).)  The latter contains the local power, providing that "[i]nitiative and referendum powers may be exercised by the electors of each city or county under procedures that the Legislature shall provide."  (*Id.*, § 11, subd. (a).)  In *Associated Home Builders*, *supra*, 18 Cal.3d 582, we briefly described the history and longstanding judicial interpretation of the initiative power.

6

The state Constitution was amended to include the initiative power in 1911. The Constitution "speak[s] of the initiative and referendum, not as a right granted the people, but as a power reserved by them." (*Associated Home Builders*, *supra*, 18 Cal.3d at p. 591.) Since then, courts have consistently declared it their duty to " 'jealously guard' " and liberally construe the right so that it " 'be not improperly annulled.' " (*Ibid.*; see, e.g., *Perry v. Brown* (2011) 52 Cal.4th 1116, 1140.) Moreover, when weighing the tradeoffs associated with the initiative power, we have acknowledged the obligation to resolve doubts in favor of the exercise of the right whenever possible. (*Associated Home Builders*, at p. 591.) We more recently explained that the enactment of the initiative power was sparked by "dissatisfaction with the then governing public officials and a widespread belief that the people had lost control of the political process." (*Perry*, at p. 1140.) Its purpose, in effect, was empowering voters to propose and adopt provisions "that their elected public officials had refused or declined to adopt." (*Id.* at p. 1140.)

When the right of initiative was grafted onto the Constitution, the Legislature also enacted statutory procedures for city and county voters to exercise the right. (*Tuolumne Jobs*, *supra*, 59 Cal.4th at p. 1042, citing Stats. 1911, Ex. Sess. 1911, ch. 33, § 1, pp. 131-132.) Most relevant here is section 9214, the current statute setting forth a local government's duty with respect to initiatives whose proponents request a special election. The provision requires the city government, upon receipt of a petition signed by not less than 15 percent of the city's voters, to (1) adopt the ordinance without alteration; (2) immediately order a special election; or (3) order an agency report and, once the report is presented to the city council, adopt the ordinance or order a special election. (§ 9214; *Tuolumne Jobs*, at p. 1033.) Section 9212 requires that an agency report be presented to the city council no later than 30 days after the initiative petition has been certified as having the sufficient number of signatures. (§ 9212, subd. (b).)

7

And section 1405 generally requires that the special election "be held not less than 88 nor more than 103 days after the date of the order of election." (§ 1405, subd. (a).) Collectively, the intended purpose of these statutes is to require "public officials to act expeditiously on initiatives." (*Tuolumne Jobs*, at p. 1037.)

Against this constitutional and statutory backdrop, we have held that the people's power to propose and adopt initiatives is at least as broad as the legislative power wielded by the Legislature and local governments. (See, e.g., *Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 253 (*Guardino*) [discussing statewide right to initiative]; *DeVita v. County of Napa* (1995) 9 Cal.4th 763, 775 (*DeVita*) [discussing local right to initiative]; *Rossi*, *supra*, 9 Cal.4th at p. 696 [noting "local initiative power may be even broader than the initiative power reserved in the Constitution"].) When voters exercise the initiative power, they do so subject to precious few limits on that power.[9] (*Rossi*, at p. 695.) Moreover, we have explained that procedural requirements imposed on the Legislature and local governments do not similarly constrain the electorate's initiative power without evidence that such was their intended purpose. (E.g., *DeVita*, at p. 785 ["existence of procedural requirements for the adoptions of local ordinances generally does not imply a restriction of the power of initiative"]; *Associated Home Builders*, *supra*, 18 Cal.3d at pp. 588, 593-596.) In *Kennedy Wholesale*, *supra*, 53 Cal.3d at pages 251 to 252, for example, we held that the constitutional requirement that the Legislature obtain a two-thirds vote before raising taxes (Cal. Const., art. XIII A, § 3) is a requirement that does not apply to voters' initiative power.

---

[9]    The most often invoked limitation is the single-subject requirement. (Art. II, § 8, subd. (d); see also art. II, §§ 8, subds. (e) & (f), 11, subds. (b) & (c), 12 [containing other narrow limitations]; see Elec. Code, § 9218 [prohibiting two special municipal elections on the same subject matter within a 12-month period].)

Just how that power relates to taxation was the subject of our holding in *Rossi*, *supra*, 9 Cal.4th 688, which concerned a city ordinance added by voter initiative. When the statewide initiative power was originally adopted, we observed, "taxation was not only a permitted subject for the initiative, but was an intended object of that power." (*Id.* at p. 699.) We found evidence of that purpose in the history of the measure that added the initiative power in 1911, the contemporary understanding of the measure, and statements made by the measure's drafter and leading proponent. (*Ibid.*) We also considered subsequent unsuccessful attempts to amend the initiative power "to exclude measures related to taxation," efforts that "would have been unnecessary if tax-related measures were not permissible subjects of the initiative." (*Ibid.*; see *id.* at pp. 699-702.) There is no restriction, we concluded, "on the use of the initiative in the area of taxation." (*Id.* at p. 702.) That is, electors may "use the initiative process to prospectively adopt or annul (repeal) statutes imposing taxes." (*Ibid.*; *id.* at p. 696.)

Whether the context involves taxation or not, all of these cases underscore how courts preserve and liberally construe the public's statewide and local initiative power. Indeed, we resolve doubts about the scope of the initiative power in its favor whenever possible (*Associated Home Builders*, *supra*, 18 Cal.3d at p. 591), and we narrowly construe provisions that would burden or limit the exercise of that power (see *Rossi*, *supra*, 9 Cal.4th at p. 696; see also *DeVita*, *supra*, 9 Cal.4th at p. 781). It is against this backdrop that we consider whether article XIII C, section 2 applies when voters seek to impose taxes via initiative.**10**

---

**10** Article XIII C, section 1, subdivision (e) defines " 'tax' " as "any levy, charge, or exaction of any kind *imposed by a local government*," with certain exceptions. (Italics added.) In light of our conclusion that article XIII C, section 2 does not apply to voter initiatives, our use of the word "tax" throughout this

B.

Article XIII C was added by Proposition 218, an initiative constitutional amendment adopted at the 1996 general election. Article XIII C, section 2, subdivision (b) provides, "No local government may impose, extend, or increase any general tax unless and until that tax is submitted to the electorate and approved by a majority vote. . . . The election required by this subdivision shall be consolidated with a regularly scheduled general election for members of the governing body of the local government . . . ." Despite no mention of voter initiatives, the City and the concurring and dissenting opinion (conc. & dis. opn., *post*, at pp. 1-2) contend this provision nonetheless applies to such instruments and, notwithstanding section 9214, requires that initiatives imposing, extending, or increasing a general tax must first be submitted to the electorate at a regularly scheduled general election, rather than a special election. We disagree.

By its terms, article XIII C, section 2 only applies to actions taken by a "local government." To cabin uncertainty about what "local government" connotes, article XIII C then defines the term to mean "any county, city, city and county, including a charter city or county, any special district, or any other local or regional governmental entity." (*Id.*, § 1, subd. (b).) The crux of the City's argument is that this definition is broad enough to include the electorate. (See conc. & dis. opn., *post*, pp. 4-5.) It is true enough that in the contemporary understanding of our democracy, governmental entities exist to serve the public, and not the other way around. (See art. II, § 1 ["[g]overnment is instituted for [the people's] protection, security, and benefit"].) But this important principle does

---

*(footnote continued from previous page)*

opinion is meant not as the term is defined in subdivision (e), but as it is commonly understood.

not, in the abstract or in the context of the laws at issue in this case, imply that we should assume the public and the governmental entity corresponding to where the public resides to be one and the same. While one understanding of a city or comparable jurisdiction might blur the distinction between its residents, electorate, and government (e.g., American Heritage Dict. of the English Language (4th ed. 2000) p. 339 ["city" includes "[t]he inhabitants of a city considered as a group"]; conc. & dis. opn., *post*, at p. 5 ["city . . . refers to the municipal corporation and body politic"]), such an interpretation is unpersuasive — at least in this context — and a survey of rationales specific to this provision, as well as broader principles in our jurisprudence, shows why.

First, the common understanding of local government does not readily lend itself to include the electorate, instead generally referring to a locality's governing body, public officials, and bureaucracy.[11] (See *Bighorn*, *supra*, 39 Cal.4th at p. 212 [using term's ordinary meaning]; see also Black's Law Dict. (4th ed. 1951) p. 824 [defining "local government" as "[t]he government or administration of a particular locality; especially, the governmental authority of a municipal corporation, as a city or county, over its local and individual affairs"].) Arguing to

---

**11**    The City argues that the separate use of the term "governing body" in article XIII C, section 2, subdivision (b) demonstrates that local government means something more than a city council. We agree. But the existence of a distinction between a local government and its governing body does not mean that local government must therefore include the electorate, any more than separate references to, say, the California Environmental Protection Agency and its top official imply the absence of a meaningful distinction between the agency and the public it serves. Nor can we ignore the distinction between the electorate and the governmental entities identified in article XIII C, section 1, subdivision (b). Consistent with its statutory definition here and its usage elsewhere in our law, the term "local government" plausibly refers to the entire organization constituting the local or regional governmental entity in question — including its bureaucracy and its corporate form — and not simply a locality's elected officials. (E.g., *Banning Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918, 925 ["every *local government* in the coastal zone must submit a local coastal program for Coastal Commission approval" (italics added)].)

the contrary, the concurring and dissenting opinion relies on *In re Pfahler* (1906) 150 Cal. 71 (*Pfahler*), a 111-year-old case cited by none of the briefs. (Conc. & dis. opn., *post*, at pp. 5-7.) But that case considered whether a constitutional provision conferring local legislative power on "[a]ny county, city, town, or township" precluded a city's charter from authorizing voters to exercise the city's power via initiative. (*Pfahler*, at p. 81.) Answering in the negative, we explained that legislative power is not inherently reserved to representative assemblies. (*Id.* at p. 83.) We did not suggest, however, that the terms "local government" and "electorate" are equivalent or not meaningfully distinguishable, particularly when considering whether explicit restrictions on the former should impliedly be imposed on the latter. (See *id.* at p. 87 [distinguishing between actions of a city council and electors].)[12]

Moreover, construing local government as an entity distinct from the public is consistent not only with how the term is used in the provision's text, but also with how it is used in its findings and declarations. (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) text of Prop. 218, p. 108 ["This measure protects taxpayers by limiting the methods by which *local governments* exact revenue *from taxpayers*" (italics added)]; see also *Orange Citizens for Parks & Recreation v. Superior Court* (2017) 2 Cal.5th 141, 154 ["The Governor's Office of Planning and Research encourages *local governments* to structure their procedures to facilitate *public involvement . . . .*" (italics added)].) Contrary to the concurring and dissenting opinion (conc. & dis. opn., *post*, at pp. 2, 5, 8), this understanding also

---

[12] Of course, in the 111 years since we decided *Pfahler*, California has borne witness to significant developments affecting the extent and significance of the initiative power. The 1906 earthquake occurred months before *Pfahler* was issued — and a political earthquake in the form of the constitutional initiative power followed five years later. Since then, we have spilt much ink regarding the nature and scope of direct democracy in this state.

12

proves compatible with section 9200, which provides that "[o]rdinances may be enacted by and for any incorporated city," encompassing situations where the electorate enacts an ordinance, via initiative, *for* the city.

Second, the only portion of article XIII C even mentioning the voters' direct democracy rights appears in section 3. (Art. XIII C, § 3 [citing art. II, §§ 8 & 9, respectively the people's initiative and referendum powers].) The concurring and dissenting opinion (conc. & dis. opn., *post*, at p. 9) concludes this language means the voters knew the initiative power could affect local taxes and, further, must mean voters intended to (silently) subsume tax-related initiatives within the ambit of article XIII C, section 2. But section 3's single reference to the initiative power proves, at best, too slender a reed to support the substantial limitations that the City and the concurring and dissenting opinion would have us read into Proposition 218's provisions. If anything, the reference in section 3 makes the omission of any limitations on the initiative power in section 2 — or anywhere else in article XIII C — even more glaring. To infer from that absence a calculated decision to squelch voters' initiative rights is essentially to embrace a presumption against the initiative power, rather than in favor of it. Such a conclusion would be profoundly at odds with our obligation to " 'jealously guard' " the voters' exercise of their initiative power. (*Associated Home Builders*, *supra*, 18 Cal.3d at p. 591.) Confronted with the text of article XIII C, a reasonable reader would be unlikely to infer that Proposition 218 was designed to regulate the initiative power through an explicit reference in section 3 and an implicit one in section 2.

Third, even if it were conceivably possible to treat the term "local government" in article XIII C as an unusually oblique reference to the voters who comprise the relevant electorate, the difficulty in accepting this inference ratchets up given how the definition of "local government" closes with the phrase, "or any

13

other local or regional governmental entity." (Art. XIII C, § 1, subd. (b).) That the elected officials and civil servants more commonly understood to be part of a local government can be surprised by the actions of the voters they serve belies the idea that the amalgam of individuals who constitute the electorate comprise a local or regional governmental entity.

What's more, the principle of *ejusdem generis* suggests that when "specific words follow general words in a statute or vice versa," the general words ordinarily are best construed in a manner that underscores their similarity to the specific words. (*International Federation of Professional & Technical Engineers, Local 21, AFL-CIO v. Superior Court* (2007) 42 Cal.4th 319, 342.) Interpreting "city" to include the electorate would give that term a much broader meaning than the adjoining specific term, "local or regional governmental entity." (Art. XIII C, § 1, subd. (b).) Thus, our interpretation of local government is consistent with the ordinary understanding of the term, the text of related provisions, and the *ejusdem generis* principle. By contrast, the interpretation of the City and the concurring and dissenting opinion would require us to insert words — such as "electorate," "voters," or "people" — into section 1, subdivision (b) and section 2, subdivision (b) of article XIII C. (See Code Civ. Proc., § 1858 ["In the construction of a statute or instrument, the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted . . ."].)

Our interpretation is also consistent with article XIII D of the state Constitution, which, like article XIII C, was added by Proposition 218. (*Greene*, *supra*, 49 Cal.4th at p. 285.) Article XIII D addresses the imposition of assessments and property-related fees by local agencies, and section 4 of that article contains a variety of procedural requirements that must be fulfilled before an "agency" may adopt an assessment (Cal. Const., art. XIII D, § 4 [e.g., notice

14

and hearing requirements].)  Article XIII D defines agency as "any local government as defined in subdivision (b) of Section 1 of [article XIII C]."  (*Id.*, § 2, subd. (a).)  Under the City's interpretation then, "agency" in article XIII D also includes voters — an understanding that seems, at best, quite an improbable version of what was plausibly contemplated when this provision was enacted.

The alternative is to treat the term "local government" as encompassing the entire coterie of individuals constituting the electorate — thus burdening voters' power to propose and adopt initiatives concerning taxation.  (*Rossi*, *supra*, 9 Cal.4th at p. 702.)  If this quite significant consequence were consistent with the most reasonable understanding of Proposition 218's purpose despite the absence of text in articles XIII C or D bolstering this view, one would assume there would be some mention of such a goal elsewhere in Proposition 218 or its ballot materials.  (*Whitman v. American Trucking Assns., Inc.* (2001) 531 U.S. 457, 468 [enactors do not "hide elephants in mouseholes"]; see *Kennedy Wholesale*, *supra*, 53 Cal.3d at p. 250.)  The City and the concurring and dissenting opinion cite no such evidence.  Nor can we find any.  To the contrary:  The crux of the concern repeatedly reflected in the ballot materials is with local governments and politicians — not the electorate — imposing taxes.  Nowhere in the materials is there any suggestion that Proposition 218 would rescue voters from measures they might, through a majority vote, impose on themselves.

For example, Proposition 218's findings and declarations state, "*local governments have subjected taxpayers* to excessive tax, assessment, fee and charge increases . . . . This measure protects taxpayers by limiting the methods by which *local governments exact revenue* from taxpayers *without their consent*."  (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) text of Prop. 218, p. 108, italics added (1996 Ballot Pamp.).)  The ballot materials are in accord.  The argument in favor of the measure, for example, stated that it "does NOT prevent government from

15

raising and spending money for vital services. . . . If *politicians want to raise taxes* they need only convince local voters that new taxes are really needed." (1996 Ballot Pamp., *supra*, argument in favor of Prop. 218, p. 76, italics added; *id.*, rebuttal to argument against Prop. 218, p. 77 ["Proposition 218 simply gives taxpayers the right to vote on taxes and *stops politicians' end-runs* around Proposition 13" (italics added)].)[13] In short, these materials indicate both that article XIII C employs the term "local government" as it is commonly understood and that the provision's intended purpose did not include limiting voters' "power to raise taxes . . . by statutory initiative."[14] (See *Kennedy Wholesale*, *supra*, 53 Cal.3d at p. 250.)

This reading finds further support in the ballot materials concerning two related initiative constitutional amendments: Proposition 13, which added article XIII A in 1978, and Proposition 26, which amended article XIII C in 2010. The ballot materials concerning both initiatives similarly evince a specific concern with *politicians* and their imposition of taxes without voter approval. (E.g., Ballot Pamp., Primary Elec. (June 6, 1978) rebuttal to argument against Prop. 13, p. 59 ["We must not let the *spendthrift politicians* continue to tax us into poverty" (italics added)]; Voter Information Guide, Gen. Elec. (Nov. 2, 2010) argument in

---

[13] The concurring and dissenting opinion (conc. & dis. opn., *post*, at p. 10) cites other statements discussing the electorate's right to vote on taxes and on local government's actions. The opinion rightly focuses on the purpose of article XIII C. (E.g., conc. & dis. opn., *post*, at pp. 2, 6 [highlighting the "stated purposes" of Prop. 218], 10 [emphasizing the provision's "overarching purpose"].) But it identifies no evidence or other reason to conclude that the provision encompasses the imposition of taxes by the electorate via initiative.

[14] The City identifies another purpose of requiring that general taxes only be considered during regularly scheduled general elections. It contends that this requirement forces politicians to face the voters at the same time as any tax proposal he or she may have supported or to answer questions about the politicians' stance on tax measures. But such a purpose makes limited sense in the context of taxes imposed by voter initiatives.

16

favor of Prop. 26, p. 60 ["STOP *POLITICIANS* FROM ENACTING HIDDEN TAXES" (italics added)]; *ibid.* ["[l]ocal *politicians* have been calling taxes 'fees' so they can bypass voters" (italics added)]; *ibid.* ["Proposition 26 requires *politicians* to meet the same vote requirements to pass these Hidden Taxes" (italics added)].) All of this is more evidence that the drafters of these propositions, like the drafters of Proposition 218, simply did not contemplate that they were affecting the power of voters to propose taxes via initiatives. (See *Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 258-260 [discussing relationship between the various propositions]; see also *Kennedy Wholesale*, *supra*, 53 Cal.3d at p. 250 ["Nothing in the official ballot pamphlet supports the inference that the voters intended to limit their own power to raise taxes in the future by statutory initiative"].)[15]

What the City contends in the alternative is that, even if "local government" does not directly encompass the electorate, article XIII C, section 2, subdivision (b) *indirectly* applies to voters for two reasons. The City contends it applies to the electorate because, in the City's view, the voters are the ones who ultimately impose *every* local tax. The City notes that, under the provision, no local government may impose a general tax "unless and until" (art. XIII C, § 2, subd. (b)) the tax is submitted to the voters and approved by a majority vote. For support the City cites *Guardino*, *supra*, 11 Cal.4th 220. But in that case, we

---

**15** The concurring and dissenting opinion posits that the ballot materials' repeated reference to "politicians," and silence regarding voter initiatives, simply reflects that "most local tax increases have, indeed, been initiated by elected officials." (Conc. & dis. opn., *post*, at p. 10.) That is certainly one possibility. Another more plausible one is that the silence with regard to initiatives reflects that the drafters either were not concerned with initiatives proposing taxes — perhaps because such was a rare or unheard of occurrence or because such would constitute an expression of direct democracy — or they simply did not have that issue in mind.

17

simply noted that a local government's imposition of a general tax "will not take effect" absent subsequent approval by the voters — in other words, the voters' approval acts as a precondition (*id.* at p. 240) to a tax measure becoming operative. But that does not transform voters into the "local government" referenced in article XIII C, section 2. Nor does it mean it is always and only the electorate that imposes a tax. Suppose a constitutional provision required that no city council could impose a zoning restriction unless and until the restriction was submitted to and approved by the city attorney. Does that mean that it is the city attorney — and not the city council — that actually imposes zoning restrictions? No.

The City also argues that article XIII C, section 2, subdivision (b) constrains voter initiatives because "statutory and constitutional limits on the power of local government apply equally to local initiatives." The City primarily relies on *Legislature v. Deukmejian* (1983) 34 Cal.3d 658, but that case offers the City no support. It involved a statutory initiative that proposed to adjust state legislative and congressional district boundaries after the Legislature had already engaged in decennial redistricting. (*Id.* at p. 663.) Noting that the state Constitution prohibited the Legislature from redistricting more than once per decade (*id.* at p. 668), we concluded that the initiative was impermissible (*id.* at p. 663). We explained that "the power of the people through the statutory initiative is coextensive with the power of the Legislature." (*Id.* at p. 675.) Yet, as we later indicated, *Legislature v. Deukmejian* simply stands for the proposition that "neither the Legislature nor the voters may enact a law of a nature that exceeds a limitation on the state's lawmaking power." (*Kennedy Wholesale*, *supra*, 53 Cal.3d at p. 252; *DeVita*, *supra*, 9 Cal.4th at p. 776 [discussing local initiatives].) By contrast, *procedural* requirements imposed on the Legislature or local governments are presumed not to apply to the initiative power absent

18

evidence that such was the intended purpose of the requirements. (*DeVita*, at p. 776; *Kennedy Wholesale*, at p. 252.) To illustrate: When a local government lacks authority to legislate in an area, perhaps because the state has occupied the field (e.g., *American Financial Services Assn. v. City of Oakland* (2005) 34 Cal.4th 1239, 1252 [predatory lending practices]), that limitation also applies to the people's local initiative power. (*DeVita*, at p. 776.) In contrast, where legislative bodies retain lawmaking authority subject to procedural limitations, e.g., notice and hearing requirements (*Associated Home Builders*, *supra*, 18 Cal.3d at p. 594) or two-thirds vote requirements (*Kennedy Wholesale*, at p. 251), we presume such limitations do not apply to the initiative power absent evidence that such was the restrictions' intended purpose. (*DeVita*, at p. 785; *Kennedy Wholesale*, at p. 252.)

The concurring and dissenting opinion interprets these cases more narrowly, as applying *exclusively* when the procedural requirements at issue are "incompatible with initiative procedures." (Conc. & dis. opn., *post*, at pp. 14-15.) Yet this reading proves too cramped an understanding of these cases' holdings or their significance. While our cases noted that the restrictions at issue made little sense in light of the distinct initiative process (e.g., *Kennedy Wholesale*, *supra*, 53 Cal.3d at p. 252, fn. 5 ["electorate does not generally follow 'legislative' procedures when exercising the initiative power"]), nothing suggests those observations formed the metes and bounds of our holding. To the contrary, our reasoning was broader and grew out of our presumption in favor of the initiative power. (E.g., *DeVita*, *supra*, 9 Cal.4th at pp. 785 ["it is well established in our case law that the existence of procedural requirements for the adoptions of local ordinances generally does not imply a restriction of the power of initiative or referendum"], 786 [this "rule is a corollary to the basic presumption in favor of the electorate's power of initiative and referendum"].)

19

Taking account of this legal context, along with the relevant provision's text and other indicia of purpose, we conclude that the requirement in article XIII C, section 2, subdivision (b) — mandating that general taxes be submitted to the voters at a regularly scheduled general election — applies only to local governments and not to the electorate's initiative power without evidence that such was the intended purpose of the requirement. The City cites no such evidence, because there is none here.

Indeed, as we observed in *Kennedy Wholesale*, 53 Cal.3d at page 252, when an initiative's intended purpose includes imposing requirements on voters, evidence of such a purpose is clear. In article XIII C, section 2, subdivision (d), for example, the enactors adopted a requirement providing that, before a local government can impose, extend, or increase any special tax, voters must approve the tax by a two-thirds vote. That constitutes a higher vote requirement than would otherwise apply. (§ 9217 [providing for a majority vote].) That the voters explicitly imposed a procedural two-thirds vote requirement on themselves in article XIII C, section 2, subdivision (d) is evidence that they did not implicitly impose a procedural timing requirement in subdivision (b). (See *Kennedy Wholesale*, at p. 252.) Moreover, had the voters wanted the procedural requirements contained in article XIII C, section 2, subdivision (b) to apply to the initiative power, Proposition 218 could have made that clear by providing, "No local government or initiative may impose, extend, or increase . . . ," by defining local government to include the electorate exercising its initiative power, or by imposing an absolute ban, i.e., "No general tax shall be imposed, extended, or increased . . . ." (See *Kennedy Wholesale*, at p. 253 [discussing similar language in Cal. Const., art. XIII A, § 1, subd. (a)].) The voters did not do so, and we will not infer such a purpose. (*Rossi*, *supra*, 9 Cal.4th at p. 694; *Kennedy Wholesale*, at p. 252 [" 'Where the electorate has demonstrated the ability to make their intent

20

clear, it is not the province of this court to imply an intent left unexpressed' "].)
Particularly because, given that article XIII C was enacted via initiative
constitutional amendment, its enactors were certainly well aware of the initiative
power. (*Lance W.*, *supra*, 37 Cal.3d at p. 890, fn. 11.)

The City offers a final reason for applying article XIII C, section 2,
subdivision (b) to the electorate here. It contends that the term "impose" in that
provision includes the collection of taxes by a local government, so subdivision
(b) precludes the City from *collecting* a general tax imposed via initiative unless
and until the tax is approved by the voters at a regularly scheduled election. Not
so. The Court of Appeal in this case concluded that the ordinary meaning of
"impose" is "to establish," not to collect (e.g., *Ponderosa Homes, Inc. v. City of
San Ramon* (1994) 23 Cal.App.4th 1761, 1770, citing Webster's 3d New Internat.
Dict. (1970) p. 1136), and because it found no reason to depart from this
understanding of the term, it construed the meaning of "impose" in article XIII C,
section 2, subdivision (b) as consistent with this understanding. We agree.
Indeed, in *Guardino*, *supra*, 11 Cal.4th 220, we interpreted nearly identical
language and reached the same conclusion. In that case, we construed a statute
added by Proposition 62, a statutory initiative adopted at the 1986 general election.
The relevant language provided, "No local government or district may impose any
special tax unless and until such special tax is submitted to the electorate . . ."
(Gov. Code, § 53722), and we explained that "impose" "in this context means
enacted." (*Guardino*, at p. 240; see *Howard Jarvis Taxpayers Assn. v. City of
Riverside* (1999) 73 Cal.App.4th 679, 681-682 [using "impose" and "enact"
interchangeably when discussing Proposition 218]; see also *Weisblat v. City of San
Diego* (2009) 176 Cal.App.4th 1022, 1034 [same with regard to Prop. 13].) This
is also consistent with usage in the relevant ballot materials. (E.g., 1996 Ballot

21

Pamp., *supra*, analysis of Prop. 218 by the Legis. Analyst, p. 73 [using "create," "establish," and "impose" interchangeably].)**16**

The City then seeks to bolster its argument for equating "impose" with "collect" by relying on *Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809. There we construed Proposition 62 for purposes of determining when the statute of limitations began to run on the plaintiffs' action against the city for wrongfully "imposing and collecting a general tax." (*Howard Jarvis*, at p. 812.) What we concluded is that the ongoing collection of the tax at issue constituted a continuing injury but, in reaching that conclusion, we relied on language stating that taxes imposed prior to the measure's enactment "shall continue to be imposed only if approved by a majority vote of the voters." (Gov. Code, § 53727, subd. (b); *Howard Jarvis*, at p. 823; see also Gov. Code, § 53728 [providing a remedy when a government continues to collect an unauthorized tax].) We explained that, "[c]learly, in this provision, 'imposition' is not limited

---

**16** Indeed, a critical aspect of our analysis involves understanding what "impose" means in the context of article XIII C. The concurring and dissenting opinion conveniently assumes its conclusions about this term by concluding in effect that only local governments can impose taxes because, administratively, only local governments can collect and spend them. (E.g., conc. & dis. opn., *post*, at pp. 2 ["A tax passed by voter initiative, no less than a tax passed by vote of the city council, is a tax of the local government, to be collected by the local government, to raise revenue for the local government"], 4 ["A local government tax is a local government tax, no matter how it may have been legislated into being"].) Here, "impose" most plausibly means to establish or enact, and article XIII C, section 2 applies only if it is the local government doing so. The concurring and dissenting opinion emphasizes that when the electorate exercises its initiative power, it is acting in a legislative capacity. (E.g., conc. & dis. opn., *post*, at pp. 4-5.) No doubt. But that is not sufficient to establish that the electorate is indistinguishable from representative politicians for the purposes of triggering article XIII C, section 2, particularly when that provision gives no indication whatsoever that it was designed to interfere with the exercise of the initiative power.

22

to the time of initial enactment . . ." and Proposition 62's intended purpose extends to cover "*continued* imposition or collection of [an unauthorized] tax as well." (*Howard Jarvis*, at pp. 823-824, italics added.) So *Howard Jarvis* is inapposite.[17]

C.

Given the language and other indicia of intended purpose for article XIII C, section 2, subdivision (b), we conclude the provision's requirements apply only when a local government seeks to impose, extend, or increase a general tax. (See *DeVita*, *supra*, 9 Cal.4th at p. 785.) By contrast, its requirement that a general tax be submitted to the voters at a general election does not apply to taxes that are imposed by initiative after securing the electorate's approval in a manner consistent with section 9214. (See *Kennedy Wholesale*, *supra*, 53 Cal.4th at pp. 251-252.) A contrary conclusion would work an implied repeal of section 9214, something against which we have a strong presumption. (E.g., *Tuolumne Jobs*, *supra*, 59 Cal.4th at p. 1039 [noting we will find an implied repeal only where there is no way to reconcile the two provisions].)

Without an unambiguous indication that a provision's purpose was to constrain the initiative power, we will not construe it to impose such limitations. Such evidence might include an explicit reference to the initiative power in a provision's text, or sufficiently unambiguous statements regarding such a purpose in ballot materials. The concurring and dissenting opinion queries " 'by what

---

[17] Although the City does not cite the provision, we note that article XIII C, section 2, subdivision (c) provides, "Any general tax imposed, extended, or increased, without voter approval, by any local government on or after January 1, 1995, and prior to the effective date of this article, shall continue to be imposed only if approved by a majority vote of the voters voting in an election on the issue of the imposition . . . ." But this language does not alter our conclusion since, here, the tax would only have been imposed if a majority of the voters had voted for it.

authority' " we require clear evidence of an intended purpose to constrain exercise of the initiative power.  (Conc. & dis. opn., *post*, at p. 14.)  Our answer is rooted firmly in the longstanding and consistent line of cases emphasizing courts' obligation to protect and liberally construe the initiative power (e.g., *Associated Home Builders*, *supra*, 18 Cal.3d at p. 591) and to narrowly construe provisions that would burden or limit its exercise (see, e.g., *Rossi*, *supra*, 9 Cal.4th at p. 696).[18]  Those cases underscore the centrality of direct democracy in the California Constitution, and the status of our presumption liberally construing the initiative power as a paramount structural element of our Constitution.  (E.g., *Associated Home Builders*, at p. 591 [describing the initiative as " 'one of the most precious rights of our democratic process' "].)  A clear statement rule is consistent with, and indeed, appropriately advances our duty to safeguard the exercise of the initiative power.  Although limits may be placed on it, and in some cases they have been, the best way to implement our oft-repeated references to the importance of the initiative is to avoid presuming that a provision constrains that power without a clear statement or equivalent evidence that such was the provision's intended purpose.

---

[18]     The concurring and dissenting opinion indicates it has "no quarrel with this general principle" (conc. & dis. opn., *post*, at p. 14), but its analysis does not sufficiently grapple with the necessary implications of that presumption.  Our cases underscore courts' obligation to " 'jealously guard' " (*Associated Home Builders*, *supra*, 18 Cal.3d at p. 591) and "liberally construe" (*Perry v. Brown*, *supra*, 52 Cal.4th at p. 1145, fn. 16) the initiative power, preserving its exercise "[i]f doubts can reasonably be resolved in favor of [its] use." (*Associated Home Builders*, at p. 591.)  While the concurring and dissenting opinion acknowledges our precedent in passing (conc. & dis. opn., *post*, at p. 14), it nonetheless begins its analysis looking for evidence that article XIII C, section 2 — which makes no reference to initiatives — evinces an intent to exempt initiatives from its provisions (conc. & dis. opn., *post*, at p. 1).  This approach relegates our previous conclusions regarding the initiative power to the status of an afterthought, likely to hold little relevance in this case or perhaps any case.

24

In reaching a contrary conclusion, the concurring and dissenting opinion starts from the premise that the electors must have wanted to tie their own hands with respect to the imposition of local taxes. This very premise then undergirds the opinion's reading of the term "local government" as necessarily including the electorate. Nothing supports this premise, despite the opinion's confident assertion — as if it were discussing the attitudes of an individual well known only to select observers — that "[w]hether a local government tax has been enacted by voter initiative or by vote of the city council is not article XIII C's concern." (Conc. & dis. opn., *post*, p. 18). Defending this assertion is difficult for the simple reason that nothing in the text of article XIII C, or its context, supports the conclusion that the term "local government" was meant to encompass the electorate. Any reasonable construction of article XIII C, section 2 must take into account the robust importance of the initiative power in other constitutional provisions — irrespective of whether or not the "voter initiative" is "article XIII C's concern" (conc. & dis. opn., *post*, p. 18). (See, e.g., *Associated Home Builders*, *supra*, 18 Cal.3d at p. 591 [describing the importance of the initiative power].)

In playing down the importance of giving full effect to these provisions, the concurring and dissenting opinion turns our case law on its head — by essentially demanding evidence that the electors intended to *exempt* the initiative power from article XIII C, section 2 as a precondition for preserving that power in unencumbered form. (E.g., conc. & dis. opn., *post*, pp. 1-2, 9.) To impose this requirement would be a stark departure from our precedent, and one impossible to square with our decisions on the power of initiative. (E.g., *DeVita*, *supra*, 9 Cal.4th at pp. 785-786 [refusing to infer limits]; *Rossi*, *supra*, 9 Cal.4th at p. 696 [emphasizing breadth of initiative power and looking for express evidence of intent to limit].) Our analysis in those decisions consistently begins with the

25

presumption that the initiative power is not constrained, then searches for clear evidence suggesting that electors could reasonably be understood to have imposed restrictions upon their constitutional power. (E.g., *Kennedy Wholesale*, *supra*, 53 Cal.3d at p. 253 [concluding the plaintiff failed to identify evidence of intent to limit initiative power]; *DeVita*, at pp. 785-786; *Rossi*, at pp. 695-696.)

What the City maintains is that our interpretation, whatever its merits otherwise, would create a kind of loophole in article XIII C, section 2. A hypothetical city council, it suggests, could conceivably collude with a public employee union to place a levy on the ballot as a means of raising revenue for a goal supported by both. To repay the union for campaign support, or simply because the union and council agree on the policy, the council accepts the union's contract proposal — which will be funded by increasing a utility tax. Under our interpretation, the City reasons, the city council could meet with the union, and the union could mobilize city employees to collect signatures on an initiative proposing the tax increase. Once enough signatures are collected — 15 percent under section 9214 or 10 percent under section 9215 — the city council could simply adopt the ordinance without submitting the tax increase to the voters. (§§ 9214, subd. (a), 9215, subd. (a).) Thus, the city council could effectively skirt article XIII C, section 2's command that "[n]o local government may impose, extend, or increase any general tax unless and until that tax is submitted to the electorate and approved by a majority vote." (*Ibid.*) These facts are not presented here, and we decline to take up what would happen should they arise.

D.

The sequence of the City's actions with respect to the initiative causes us to make a final observation. Upon receiving a petition signed by not less than 15 percent of the city's voters, section 9214 obliges a city to (1) adopt the ordinance without alteration; (2) immediately order a special election; or (3) order an agency

26

report and, once the report is presented to the city council, adopt the ordinance or order a special election. These deadlines are mandatory (*Tuolumne Jobs*, *supra*, 59 Cal.4th at p. 1038), and the City erred when it ignored them. Its unilateral determination that the proposed initiative constituted a general tax and was therefore governed by article XIII C, section 2 did not relieve it of its obligation to adhere to section 9214 — particularly given that the initiative purported to propose a "fee" and was thus, facially at least, not a tax measure. In the future, cities should follow section 9214 and order a special election. At that point, either the city or other interested parties may pursue any appropriate legal challenge to the measure either in the pre-, or more likely, postelection context. (E.g., *Legislature v. Deukmejian*, *supra*, 34 Cal.3d at pp. 665-666 [discussing the propriety of preelection review].)

## III.

Multiple provisions of the state Constitution explicitly constrain the power of local governments to raise taxes. But we will not lightly apply such restrictions on local governments to voter initiatives, " 'one of the most precious rights of our democratic process.' " (*Associated Home Builders*, *supra*, 18 Cal.3d at p. 591.) Only by approving a measure that is unambiguous in its purpose to restrict the electorate's own initiative power can the voters limit such power, tying themselves to the proverbial mast as Ulysses did. Unless a provision explicitly constrains the initiative power or otherwise provides a similarly clear indication that its purpose includes constraining the voters' initiative power, we will not construe provisions as imposing such limitations. (See *Kennedy Wholesale*, *supra*, 53 Cal.3d at p. 252.) We conclude that article XIII C, section 2, subdivision (b) does not limit voters' power to propose and adopt initiatives concerning taxation. Neither the provision's text nor anything else shedding light on its intended purpose support a contrary conclusion. We affirm the Court of Appeal's judgment in its entirety.

**CUÉLLAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**

28

**CONCURRING AND DISSENTING OPINION BY KRUGER, J.**

Having gathered the necessary number of signatures, proponents of a local voter initiative requested that the city council of the City of Upland order a special election to present the initiative to the voters. The city council refused, concluding that one of the initiative's provisions imposed an "annual Licensing and Inspection fee" that was in fact a disguised general tax, and, as such, required voter approval at a general, rather than special, election under article XIII C of the California Constitution. (Cal. Const., art. XIII C (article XIII C), added by Prop. 218, approved by voters, Gen. Elec. (Nov. 5, 1996) (Proposition 218).) I agree with the majority that the city council erred in refusing the request, though for a narrow reason: The city council should have put the initiative on the special election ballot and left questions about the validity of the fee to be sorted out in the courts. That conclusion would suffice to dispose of this case, which, as the majority says, is now moot in any event. (See maj. opn., *ante*, at p. 5.)

The bulk of the majority opinion, however, addresses the separate question whether article XIII C, which imposes certain requirements for voter approval of local government taxes, applies at all to taxes enacted by initiative. The majority says no: In the majority's view, when article XIII C speaks of taxes imposed by local government, it means taxes enacted by the city council or other public officials; local taxes enacted by voter initiative are exempt. (See maj. opn., *ante*, at p. 23.) But article XIII C contains no such exemption, and I see no basis for

1

interpreting it as though it did.  It is a basic tenet of the system that when a city's voters enact legislation by initiative, they do so "by and for" the city itself.  (Elec. Code, § 9200.)  A tax passed by voter initiative, no less than a tax passed by vote of the city council, is a tax of the local government, to be collected by the local government, to raise revenue for the local government.  None of this could have been lost on the electorate that, also by initiative, amended the California Constitution to set ground rules for voter approval of local taxes.

I concur in the judgment and in part II.D. of the majority opinion.  I respectfully dissent from the rest.

## I.

## A.

Proposition 218, which added articles XIII C and XIII D to the California Constitution, is one of a series of voter initiatives imposing certain limitations on state and local governments' taxing authority.  (See *Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 258–260 (*Jacks*).)  Since the first of these initiatives was passed in 1978, a recurring theme has been the expansion of voter approval requirements for the imposition of taxes.  (See *ibid.*)  Proposition 218, passed for the stated purposes of " 'limiting local government revenue and enhancing taxpayer consent' " (*Jacks*, at p. 267), is no exception to the rule.

Borrowing and extending requirements introduced in previous voter initiatives, Proposition 218 set out two basic requirements for voter approval of local tax levies.  (Art. XIII C, § 2; cf. Gov. Code, §§ 53722–53724 [voter approval requirements of Prop. 62, approved by voters in 1986].)  As to general taxes, article XIII C provides:  "No local government may impose, extend, or increase any general tax unless and until that tax is submitted to the electorate and approved by a majority vote. . . .  The election required by this subdivision shall be

2

consolidated with a regularly scheduled general election for members of the governing body of the local government . . . ." (Art. XIII C, § 2, subd. (b) (section 2(b)); see *id.*, § 1, subd. (a) [defining " '[g]eneral tax' " as "any tax imposed for general governmental purposes"].) As to special taxes, article XIII C provides: "No local government may impose, extend, or increase any special tax unless and until that tax is submitted to the electorate and approved by a two-thirds vote." (*Id.*, § 2, subd. (d) (section 2(d)); see *id.*, § 1, subd. (d) [defining " '[s]pecial tax' " as "any tax imposed for specific purposes"].) For purpose of both provisions, the term " '[l]ocal government' means any county, city, city and county, including a charter city or county, any special district, or any other local or regional governmental entity." (*Id.*, § 1, subd. (b).)

Both of these voter approval requirements differ from the statutory rules that ordinarily govern passage of local voter initiatives.[1] If a local ordinance is proposed by an initiative petition with the necessary level of support, the initiative must, on request, be presented to the voters at a special (rather than general) election. (See Elec. Code, §§ 1405, subd. (a), 9214; see also *id.*, §§ 9116, 9310.) Such a proposed local ordinance ordinarily becomes law if a majority of the voters (rather than a supermajority) votes in favor of it. (See *id.*, § 9217; see also *id.*, §§ 9122, 9320.)[2]

---

[1] The Elections Code provides initiative procedures for general law cities, counties, and districts. Charter cities may set their own initiative procedures. (See Cal. Const., art. II, § 11, subd. (a); Elec. Code, § 9247; e.g., S.F. Charter, § 14.101.) The City of Upland is a general law city subject to the general statutory requirements. (See Elec. Code, § 9200 et seq.)

[2] A city council or other local legislative body may also directly adopt an ordinance proposed by initiative petition; if it does so, it is not required to submit the proposed ordinance to the voters. (See Elec. Code, §§ 9214–9215; see also *id.*, §§ 9116, 9118, 9310–9311.) Like the majority, I set to one side this method of enactment, which is not at issue in this case (see maj. opn., *ante*, at pp. 26–27),

3

We are here specifically concerned with the rule in article XIII C, section 2(b) requiring that general taxes be approved by the voters at a general election. The rule, by its terms, applies to taxes imposed by "local government" — a term defined to include cities and counties, as well as other local and regional governmental entities.[3] The question is whether a tax is imposed by local government — here, the City of Upland — when the tax has been enacted by voter initiative, rather than by the city council directly. The answer, as I see it, is yes: A local government tax is a local government tax, no matter how it may have been legislated into being.

The argument to the contrary depends on the idea that there is for these purposes some relevant difference between a tax enacted by the City of Upland and a tax enacted by City of Upland voters exercising their initiative power. There is not. The initiative power is the people's power to enact the legislation by which they will be governed in the name of the state or relevant political subdivision. (See *Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1042 (*Professional Engineers*); see also, e.g., *American Federation of Labor v. Eu* (1984) 36 Cal.3d 687, 695 [the voter initiative "is not a public opinion poll. It is a method of enacting legislation"].) This means that when a city's voters exercise the power of initiative, they do not act merely as members of

*(footnote continued from previous page)*

and instead focus on ordinances proposed by initiative petition and submitted to the voters for approval. As I read it, however, article XIII C, section 2(b) applies equally to all local general taxes, without regard to the manner of proposal or enactment.

[3] By its terms, article XIII C applies to charter cities and other local governments alike (art. XIII C, § 1, subd. (b)), whereas the Elections Code's initiative procedures do not necessarily apply to charter cities (see *ante*, fn. 1).

the public (cf. maj. opn., *ante*, at p. 11), but as legislators; in this capacity, their power to legislate is "generally co-extensive with the legislative power of the local governing body" (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 775 (*DeVita*)). When the electorate of a city exercises the power of initiative, it exercises the legislative authority of the city, to enact laws "by and for [the] city." (Elec. Code, § 9200.) And if the initiative succeeds, the ordinance "become[s] a valid and binding ordinance of the city," just as an ordinance enacted by the city council would. (*Id.*, § 9217.)

These concepts are not remotely novel, and they point to a simple answer here. It is, as a matter of fact, much the same answer as the one this court gave more than a century ago, when it was asked to consider whether a constitutional provision granting legislative authority to " '[a]ny county, city, town, or township' " included the exercise of the initiative power by the voters of the City of Los Angeles. (*In re Pfahler* (1906) 150 Cal. 71, 80 (*Pfahler*), quoting Cal. Const., art. XI, former § 11.)[4] The court held that it did. In so holding, the court made short work of the argument that the provision's reference to a " 'city' " "must be construed as meaning some board or officers of the city." (*Pfahler*, at p. 81 ["Manifestly, there is nothing in this claim."].) The city, the court concluded, instead refers to the municipal corporation and body politic. On that understanding, the court concluded that the California Constitution's reference to lawmaking by the "city" encompassed the "direct exercise of legislative power by the people" of the City of Los Angeles. (*Id.* at p. 83; see *id.* at pp. 81–84.)

---

[4] *Pfahler*, *supra*, 150 Cal. 71, predated the 1911 amendment to the California Constitution reserving the people's powers of initiative and referendum. The initiative at issue had been enacted pursuant to a provision of the charter of the City of Los Angeles.

5

So too here, when article XIII C speaks of taxes imposed by "local government" — a term it defines to include "city" — the reference is naturally read to include local taxes enacted by voter initiative, just as it includes taxes enacted by vote of the city council or of any other legislative or governmental body. And that reading makes perfect sense in the context of Proposition 218 — an initiative passed for the stated purposes of " 'limiting local government revenue and enhancing taxpayer consent' " (*Jacks*, *supra*, 3 Cal.5th at p. 267) — and particularly in the context of article XIII C (entitled "Voter Approval for Local Tax Levies"), a provision we have previously described as applicable to "all local taxes" (*Jacks*, at p. 256). After all, a local tax law passed by initiative is still a local tax law, just like any law passed by elected officials — a law of the local government, to be enforced by local government, for the purpose of raising revenue for local government.

**B.**

The majority's primary response is that the term "local government" is an "unusually oblique" way of referring to voters, if that is what article XIII C was meant to do. (Maj. opn., *ante*, at p. 13.) The majority also points to article XIII C's definition of " '[l]ocal government,' " which includes the catchall phrase "any other local or regional governmental entity" (art. XIII C, § 1, subd. (b)), and to the definition of the term " '[a]gency' " in article XIII D, which was also added by Proposition 218 and which incorporates article XIII C's definition of local government (maj. opn., *ante*, at pp. 13–15, citing art. XIII D, § 2, subd. (a)). According to the majority, it is "improbable" that Proposition 218 voters would have chosen the words "local government," "local or regional governmental entity," and "agency" to refer to the voters acting by initiative. (Maj. opn., *ante*, at p. 15; see *id.* at pp. 13–15.) In the majority's view, these terms are more readily

6

read as "referring to a locality's governing body, public officials, and bureaucracy." (*Id.* at p. 11; see *id.* at pp. 11–15.)

As I see it, there is nothing improbable about the conclusion that when article XIII C says "[n]o local government may impose" taxes without satisfying certain voter approval requirements, it means that all local government taxes must satisfy these requirements. (Art. XIII C, § 2(b).) The power to tax is a power of government. (See *Watchtower B. & T. Soc. v. County of L.A.* (1947) 30 Cal.2d 426, 429; see also Cal. Const., art. XI, § 11 [the Legislature may not delegate the power to levy taxes to a private person].) And inasmuch as only government can impose taxes, it should not be surprising that Proposition 218 is directed to government and "governmental entit[ies]." (Art. XIII C, § 1, subd. (b).)

But equally to the point, Proposition 218's enactors did not leave us guessing about what they meant by the term "local government": The term is defined, and the definition includes, as relevant here, "city." (*Ibid.*) It is true, as the majority emphasizes, that the voters are not the city itself. But neither is the city council. (See *Pfahler*, *supra*, 150 Cal. at p. 81 ["The common council or other local legislative body and other charter officers do not constitute the 'city,' but are merely agents or officers of the city."]; *id.* at pp. 85–86 [rejecting "the erroneous assumption . . . that the city council is the 'city' "].) Both bodies are, however, empowered to exercise the legislative authority of the city, and the products of their efforts equally become the city's law. If a tax enacted by the city council is a tax imposed by the city, so too is a tax enacted by the voters on the city's behalf.

As should by now be clear, this understanding of article XIII C does not require us to conclude, as the majority suggests, that the term "local government" is simply a synonym for "voters," or vice versa. We likely would not, for example, read a provision requiring local government to submit a "local coastal

7

program for Coastal Commission approval" as calling for citizen drafting sessions in local polling places. (Maj. opn., *ante*, at p. 11, fn. 11.) But what this example illustrates is a point about the allocation of power and responsibility within local government, not any fundamental incompatibility in terms. We do not read the coastal program provision in this manner, not because we believe the voter initiative process is categorically outside the bounds of local government, but because we understand that the voter initiative process is not the sum total of local government; many local government functions (including, typically, the drafting of local coastal programs) are discharged by other means.

The case before us, by contrast, concerns the government's power to establish taxes — a power that is shared by the people and their elected representatives. (See *Rossi v. Brown* (1995) 9 Cal.4th 688, 699–705 (*Rossi*); maj. opn., *ante*, at p. 9.) The question is whether a tax law of a local government — here, the City of Upland — is a tax imposed by the local government, even though it happens to have been enacted by vote of the electorate rather than of the city council. (Art. XIII C, § 2(b).) To answer that question in the affirmative in no way implies that the terms "local government," "local or regional governmental entity," and "agency" are interchangeable with "voters." (See maj. opn., *ante*, at pp. 13–15.) It simply requires reaffirmation of the settled principle that when the voters act in their legislative capacity through the initiative process, they enact legislation "by and for" the governmental entity in question. (Elec. Code, § 9200; see *id.*, § 9217; see also *id.*, §§ 9100, 9125, 9300, 9323.)[5]

---

[5] Elections Code section 9200 provides in full: "Ordinances may be enacted by and for any incorporated city pursuant to this article." The majority says its reasoning is "compatible with section 9200" because "the electorate enacts an ordinance, via initiative, *for* the city." (Maj. opn., *ante*, at p. 13.) This response simply ignores the first preposition ("by"). If what the majority means to suggest

8

The majority also relies on section 3 of article XIII C, which provides that "the initiative power shall not be prohibited or otherwise limited in matters of reducing or repealing any local tax, assessment, fee or charge," and "[t]he power of initiative to affect local taxes, assessments, fees and charges shall be applicable to all local governments . . . ." (Art. XIII C, § 3; see maj. opn., *ante*, at p. 13.) But section 3 cuts against, not in favor of, the majority's conclusion. It confirms that Proposition 218's enactors were aware of "[t]he power of initiative to affect local taxes," and, moreover, understood the connection between the initiative power and the conduct of local government. Had the enactors intended to exempt voter initiatives from article XIII C, section 2's restrictions on new or increased local government taxes, it would have been easy enough to say so. That the enactors provided for no such exemption, despite clearly signaling their awareness of "[t]he power of initiative to affect local taxes," is strong evidence that no such exemption exists.

## C.

The majority attempts to derive support for its voter initiative exemption from various extratextual considerations, but its efforts are unavailing. The majority begins by observing that Proposition 218's ballot materials do not say, in terms, that the voter approval requirements in article XIII C, section 2 were designed to apply to voter initiatives, and at various points indicate that

---

*(footnote continued from previous page)*

is that some ordinances enacted under that article of the Elections Code are enacted "by" a city, while others may be enacted "for" a city by some group of third party actors, it suffices to observe that no such distinction appears on the face of the statute, and long-held understandings of the nature of the initiative power are to the contrary. (See *Pfahler*, *supra*, 150 Cal. at p. 81.)

9

Proposition 218 was concerned with "politicians" raising taxes. (Maj. opn., *ante*, at pp. 15–17.) These references are not surprising, given that most local tax increases have, indeed, been initiated by elected officials, and few political campaigns are hampered by inveighing against "politicians." But the ballot materials make clear that the overarching purpose of Proposition 218 was more generally to "constrain local governments' ability to impose fees, assessments, and taxes." (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) analysis of Prop. 218 by Legis. Analyst, p. 73.) And the arguments in favor of Proposition 218 also refer generally to guaranteeing the right to vote on local taxes and fees, with the particulars depending on the type of exaction at issue. (See, e.g., Ballot Pamp., argument in favor of Prop. 218, at p. 76 ["Proposition 218 guarantees your right to vote on local tax increases"]; *id.*, rebuttal to argument against Prop. 218, at p. 77 ["Proposition 218 expands your voting rights. It CONSTITUTIONALLY GUARANTEES your right to vote on taxes."].) Nothing in the ballot materials suggests that Proposition 218's enactors intended to create an exemption for the subset of local taxes that are enacted by voter initiative.

As the majority acknowledges, despite the broad statements in the ballot materials concerning the right to vote on taxes, article XIII C does more than simply secure the right to vote on taxes (a right voters generally have, with or without article XIII C, when a tax is proposed by initiative petition). Article XIII C secures the right to vote in a particular manner, and defines the applicable margin of victory. In particular, article XIII C, section 2(b) secures the right to vote on local general taxes at a general, rather than special, election, and section 2(d) provides that the imposition of local special taxes requires a two-thirds supermajority, rather than a simple majority. Article XIII C thus secures for

10

the voters a set of rights concerning local taxes that they might not otherwise have under the usual rules governing passage of voter initiatives.[6]

The majority suggests in passing that the specific aim of article XIII C, section 2(b)'s general election requirement may be one specific to taxes proposed by elected officials: that is, to ensure that politicians are required to face the voters on the same ballot as the taxes they have proposed. (Maj. opn., *ante*, at p. 16, fn. 14.) Perhaps. Or perhaps the aim is to ensure that general taxes are "voted on in general elections with their traditionally larger turnouts, not done in a corner in the middle of January in an odd-numbered year." (*Jeffrey v. Superior Court* (2002) 102 Cal.App.4th 1, 8 ["The obvious import of Government Code section 36502 is that a local term-limits initiative should not be sneaked through the electorate by scheduling it in a special municipal election where the turnout percentage is unlikely to reach double digits."].) Certainly the proponents of the

---

**6** The majority suggests that construing article XIII C, section 2(b) to apply to initiative measures "would work an implied repeal of [Elections Code] section 9214, something against which we have a strong presumption." (Maj. opn., *ante*, at p. 23.) That is, according to the majority, section 2(b)'s requirement of a *general* election for a local general tax would effectively override a city council's statutory duty to call a *special* election for certain ordinances proposed by initiative petition. But the way to harmonize these provisions is to recognize that, while Elections Code section 9214 sets out the general requirements for local initiatives, the more specific requirement of article XIII C, section 2(b) applies when an initiative measure — or a provision thereof, if severable — concerns general taxes. As a technical matter, a city council can fulfill its duty to call a special election under section 9214 even if the measure voted on at the special election cannot go into effect because it imposes, extends, or increases a general tax, and must be approved by the voters at a general election under section 2(b). But to the extent there is any conflict, section 2(b) must control, since article XIII C applies "[n]otwithstanding any other provision of th[e] Constitution" (art. XIII C, § 2), including the provision allowing the Legislature to prescribe procedures for local initiatives (Cal. Const., art. II, § 11, subd. (a)). (Cf. *Professional Engineers*, *supra*, 40 Cal.4th at pp. 1037–1048.)

11

initiative here appear to regard the requirement as a meaningful constraint on their ability to enact the proposed legislation; otherwise the case would not be before us. We cannot, in any event, simply dismiss article XIII C, section 2(b)'s general election requirement as beside the point in the context of local taxes enacted by voter initiative (and I do not understand the majority to seriously contend otherwise).

The critical language we are construing here, moreover, appears in essentially identical form in article XIII C, section 2(d), which requires that special taxes be approved by a two-thirds vote of the electorate. That provision, in language that closely parallels that of section 2(b), provides that "[n]o local government may impose, extend, or increase any special tax unless and until that tax is submitted to the electorate and approved by a two-thirds vote." (Art. XIII C, § 2(d).) If a local tax enacted by voter initiative is not a tax "impose[d]" by "local government," as the majority insists, then from here on out, special taxes can be enacted by a simple majority of the electorate, as long as proponents can muster the necessary quantum of support to require consideration of the measure. (See Elec. Code, §§ 9122, 9217, 9320 [a proposed initiative measure is enacted if approved by a majority of the voters]; see also, e.g., *id.*, §§ 9116, 9118, 9214, 9215, 9310, 9311 [ballot thresholds for counties, general law cities, and districts]; S.F. Charter, § 14.101 [ballot thresholds for one charter city].) It is unlikely that Proposition 218's enactors, who deliberately chose a supermajority requirement for the imposition of special taxes, intended such a result.[7]

---

[7]    The majority opinion contains language that could be read to suggest that article XIII C, section 2(d) should be interpreted differently from section 2(b). (See maj. opn., *ante*, at p. 20 [noting that the enactors of Prop. 218 "explicitly imposed a procedural . . . requirement on themselves in" art. XIII C, § 2(d), which "is evidence that they did not implicitly" do so in § 2(b)].) I see no basis for

Finally, even if any doubts might remain after considering article XIII C's text, purposes, and history, those doubts ought to be resolved in favor of applying article XIII C's requirements to the enactment of new city taxes by voter initiative. Proposition 218 instructs that its provisions must "be liberally construed to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent." (Prop. 218, § 5, reprinted at Historical Notes, 2B West's Ann. Cal. Const. (2013 ed.) foll. art. XIII C, § 1, p. 363.) The majority instead adopts a cramped interpretation of article XIII C that undermines, rather than effectuates, those purposes.

## II.

Although the majority insists that its interpretation reflects the better reading of the constitutional text, it implicitly acknowledges otherwise when it invokes a new clear statement rule to guide its interpretation: "Unless a provision explicitly constrains the initiative power or otherwise provides a similarly clear indication that its purpose includes constraining the voters' initiative power, we will not construe provisions as imposing such limitations." (Maj. opn., *ante*, at p. 28.) In other words, according to the majority, it is not enough that article XIII C imposes generally applicable voter approval requirements for the

---

*(footnote continued from previous page)*

construing the two provisions differently. Sections 2(b) and 2(d) are, in all pertinent respects, indistinguishable. They are written in almost identical language, each providing that "[n]o local government may impose, extend, or increase" a particular kind of tax "unless and until that tax" is approved in a particular manner. (Art. XIII C, § 2(b) & (d).) The same definition of "local government" applies to both subdivisions. (*Id.*, § 1.) If the majority is unwilling to accept the logical consequences of its interpretation of article XIII C, its reservations should cause it to reexamine its position; simply avoiding the implications of its approach will not do.

13

enactment of local taxes; the law must contain a "clear statement or equivalent evidence" that the requirements are meant to apply to local taxes enacted by voter initiative.  (Maj. opn., *ante*, at p. 24.)

What we have said of other such clear statement rules is equally true here: It is not clear "by what authority" the majority proposes to "dictate to legislative drafters the forms in which laws must be written to express the legislative intent." (*In re Pedro T.* (1994) 8 Cal.4th 1041, 1048–1049.)  The majority attempts to draw support for its clear statement rule from the general background principle that the initiative right must be " 'jealously guard[ed],' " and that doubts accordingly must generally be resolved in favor of the exercise of the right. (*Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 591 (*Associated Home Builders*); see maj. opn., *ante*, at pp. 6–9.)  I have no quarrel with this general principle.  But there is an important difference between a rule that resolves "reasonable doubts" in favor of preserving the right of initiative (*Rossi*, *supra*, 9 Cal.4th at p. 711) — that is, the rule established by our cases — and the majority's novel clear statement rule, which would authorize courts to override the most natural reading of an across-the-board voter approval requirement simply because there are no "explicit reference[s] to the initiative power" or "sufficiently unambiguous statements . . . in ballot materials" (maj. opn., *ante*, at p. 23).

The cases on which the majority relies do not support the heightened standard it applies here.  In most of those cases, this court declined to extend procedural requirements obviously aimed at the conduct of a city council or other governing body because the requirements were incompatible with the initiative power — not simply for want of an "explicit reference" to an intent to place parallel limitations on professional legislators and the electorate.  (Maj. opn., *ante*,

14

at p. 23.) In *Associated Home Builders*, *supra*, 18 Cal.3d 582, for example, this court held that state zoning laws imposing notice and hearing requirements on certain ordinances had been drafted "with a view to ordinances adopted by vote of the city council," and did not apply to initiative measures, because the procedural requirements would "effectively bar[] initiative action" and thus "would be of doubtful constitutionality." (*Id.* at pp. 594, 595.) Similarly, in *DeVita*, *supra*, 9 Cal.4th 763, this court held that general plans can be amended by initiative without meeting the public hearing and consultation requirements applicable to local governing bodies, because those requirements would be incompatible with initiative procedures. (*Id.* at pp. 785–787; see also *Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1038 [direct adoption of a proposed initiative measure by a city council is not subject to CEQA review because "if prior CEQA review is required, a city could *never* adopt a voter initiative . . . if that initiative had any potential impact on the environment"].) In each case, the procedural requirements at issue were clearly aimed at governing bodies and would have been incompatible with initiative procedures; the court declined to infer from the existence of these requirements an intent to extinguish the initiative power altogether.

Here, by contrast, no similar considerations are present. Article XIII C, section 2(b) does not "squelch voters' initiative rights," as the majority claims. (Maj. opn., *ante*, at p. 13.) It does not constrain the voters' ability to propose ordinances by initiative petition, and it expressly envisions a specific avenue for voter participation — approval at a general election. Section 2(b) does not " 'place an insurmountable obstacle in the path of the initiative process and effectively give legislative bodies the only authority to enact this sort of . . . ordinance.' " (*DeVita*, *supra*, 9 Cal.4th at p. 786.)

15

Nor does *Kennedy Wholesale, Inc. v. State Bd. of Equalization* (1991) 53 Cal.3d 245 support the majority's heightened standard. In *Kennedy Wholesale*, the plaintiff argued that article XIII A, section 3 of the California Constitution, which requires state tax increases to be approved by a two-thirds vote of the Legislature, barred initiatives raising state taxes or, in the alternative, required initiatives raising state taxes to be approved by an analogous two-thirds vote of the electorate. This court rejected both arguments. As to the first argument, the court found the language ambiguous, and declined to construe it to impliedly repeal the reserved constitutional right of initiative. (*Kennedy Wholesale*, at pp. 249–251.) As to the second argument, the court noted that the supermajority voting requirement was addressed expressly and exclusively to the Legislature, and, if applied to initiatives, would expressly conflict with another constitutional provision providing for a majority vote. (*Kennedy Wholesale*, at pp. 251–252, citing Cal. Const., art. II, § 10, subd. (a).) Moreover, with respect to both arguments, the court stated: "For the voters to have limited their power in the manner that plaintiff suggests would . . . have made no sense," because "it would still be possible for a simple majority of voters to raise taxes by amending section 3." (*Id.* at p. 250.)

Here, again, article XIII C, section 2(b) is not explicitly aimed at governing bodies and is not plausibly understood to eliminate the power of the voters to impose, extend, or increase local general taxes by initiative. Construing section 2(b) to apply to initiatives would not expressly conflict with any other constitutional provision,[8] nor is there anything nonsensical about this construction.

---

[8]     As the majority points out, construing article XIII C, section 2(b) to apply to initiative measures may conflict with *statutory* provisions (see maj. opn., *ante*, at p. 23), but this conflict is much less of a cause for concern (see *ante*, fn. 6).

While statewide voters can override a constitutional provision by majority vote (*Kennedy Wholesale*, at p. 250), *local* voters acting by initiative cannot do the same.

If precedent does not explain the majority's clear statement rule, what does?  Ultimately, the majority tells us, the rule is for the voters' own good:  to prevent voters from too readily "tying themselves to the proverbial mast as Ulysses did" to resist the siren song of power.  (Maj. opn., *ante*, at p. 28; see *id.* at p. 2.)  And so in the name of cutting the voters loose from their self-imposed restraints, the majority thwarts the evident intent of the voters who passed Proposition 218 for the sake of governing all local taxes, not just some.

### III.

The final part of the majority opinion does make one point with which I agree.  (Maj. opn., *ante*, at p. 27.)  This case arose because plaintiffs submitted a valid initiative petition containing signatures of at least 15 percent of the voters of the City of Upland, which obligated the city council either to adopt plaintiffs' proposed medical marijuana ordinance outright or to submit it to the voters at a special election.  (Elec. Code, § 9214.)  The city council did neither; it instead unilaterally determined that the annual licensing and inspection fee included in the proposed ordinance, if enacted, would be a new general tax, such that the measure had to be voted on at a general, not special, election.  This was not the city council's determination to make, and plaintiffs were entitled to a writ of mandate compelling the city council to order a special election for the purpose of considering the proposed initiative measure.  (See, e.g., *Farley v. Healey* (1967) 67 Cal.2d 325, 327; *Blotter v. Farrell* (1954) 42 Cal.2d 804, 812–813.)  I would affirm the judgment on that basis alone.

Although I agree with the majority that plaintiffs were entitled to have their proposed ordinance submitted to the voters at a special election, I cannot agree

17

that approval at a special election would have sufficed if, in fact, the challenged licensing and inspection fee was a general tax.  Article XIII C is a constitutional restriction on the taxation power of local government, and, by its terms, it applies to the imposition of all local government taxes.  Whether a local government tax has been enacted by voter initiative or by vote of the city council is not article XIII C's concern.  Accordingly, while I concur in the majority's judgment, I do not join most of its reasoning.

**KRUGER, J.**

**I CONCUR:**

**LIU, J.**

18

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** California Cannabis Coalition v. City of Upland

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 245 Cal.App.4th 970
**Rehearing Granted**

_____

**Opinion No.** S234148
**Date Filed:** August 28, 2017

_____

**Court:** Superior
**County:** San Bernardino
**Judge:** David Cohn

_____

**Counsel:**

Roger Jon Diamond for Plaintiffs and Appellants.

Munger, Tolles & Olson, Ronald L. Olson, Fred A. Rowley, Jr., Mark R. Yohalem and David J. Feder for Chargers Football Company as Amicus Curiae on behalf of Plaintiffs and Appellants.

Howard Jarvis Taxpayers Foundation, Jonathan M. Coupal, Trevor A. Grimm, Timothy A. Bittle, Brittany A. Sitzer; Jones & Mayer, James R. Touchstone and Krista MacNevin Jee for Defendants and Respondents.

Nick Bulaich as Amicus Curiae on behalf of Defendants and Respondents.

Dakessian Law, Mardiros H. Dakessian and Ruben Sislyan for California Taxpayers Association as Amicus Curiae on behalf of Defendants and Respondents.

William A. Adams, Rick A. Waltman and Robert T. Bryson II for Public Interest Advocacy Clinic as Amicus Curiae on behalf of Defendants and Respondents.

Jack Cohen as Amicus Curiae on behalf of Defendants and Respondents.

Daniel S. Hentschke; Remcho, Johansen & Purcell, Robin B. Johansen; Colantuono, Highsmith & Whatley, Michael G. Colantuono and Ryan Thomas Dunn for League of California Cities as Amicus Curiae on behalf of Defendants and Respondents.

Meriem L. Hubbard and Harold E. Johnson for Pacific Legal Foundation as Amicus Curiae on behalf of Defendants and Respondents.

Nikki E. Dobay, Fredrick J. Nicely and Karl A. Frieden for Council on State Taxation as Amicus Curiae on behalf of Defendants and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Roger Jon Diamond
2115 Main Street
Santa Monica, CA  90405
(310) 399-3259

Timothy A. Bittle
Howard Jarvis Taxpayers Foundation
921 Eleventh Street, Suite 1201
Sacramento, CA  95814
(916) 444-9950