Filed 12/31/24  Conservatorship of the Person of G.M. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| Conservatorship of the Person of G.M. | B331675 |
| | (Los Angeles County Super. Ct. No. 20HWMH00068) |
| S.M., as Conservator, etc., Petitioner and Respondent. v. G.M., Objector and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Scott R. Herin, Judge.  Dismissed.

Jean Matulis, under appointment by the Court of Appeal, for Objector and Appellant.

Ellen S. Finkelberg for Petitioner and Respondent, S.M.

G.M. appeals from an order reappointing her daughter S.M. conservator of her person under the Lanterman-Petris-Short (LPS) Act (Welf. & Inst. Code,[1] § 5000 et seq.) for the fourth consecutive year. During the pendency of the appeal, the trial court terminated the conservatorship, making the resolution of the appeal moot. G.M. nonetheless asks us to decide, as an issue of public importance that would otherwise evade review, whether the trial court was authorized to consider G.M.'s capacity to care for herself and her health under a statute that, at the time, directed courts to decide whether a proposed conservatee is able to provide for her "basic personal needs for food, clothing, or shelter." (Former section 5008, subdivision (h)(1)(A).)

## I. BACKGROUND

### A. Prior Conservatorship Proceedings

In January 2020, the Los Angeles County Office of the Public Guardian filed a petition for the appointment of a conservator of the person and estate over G.M., who was at the time in a criminal detention facility.[2] The petition asserted G.M. had been hospitalized due to her unstable and deteriorated mental condition, had been diagnosed with schizoaffective disorder, had been evaluated and determined to be gravely disabled, and was unwilling to or incapable of accepting treatment voluntarily. The court granted the petition and

---

[1]    Undesignated statutory references that follow are to the Welfare and Institutions Code.

[2]    G.M. had been charged with vandalism (Pen. Code, § 594), defrauding an innkeeper (Pen. Code, § 537, subd. (a)(1)), and two counts of battery (Pen. Code, § 242).

appointed S.M., G.M.'s daughter, as conservator over her person only.[3]

S.M. petitioned to renew the conservatorship in late 2020, and the trial court granted the petition. S.M. filed another petition for renewal in late 2021, which the trial court also granted.

### B. The Request to Renew the Conservatorship at Issue in This Appeal

S.M. again petitioned for reappointment as G.M.'s conservator in late 2022. In support of her petition, S.M. submitted a declaration from Dr. Michael Rosberg.

Dr. Rosberg opined G.M. continued to express symptoms consistent with schizoaffective disorder and lacked the ability to see a connection between consistent care and her current stability. Dr. Rosberg opined G.M. could not provide for her basic needs in an unsupervised setting and was not capable of or willing to accept voluntary treatment. Regarding the latter opinion, Dr. Rosberg reported G.M. had indicated a desire to stop taking her medication (a monthly injection) as soon as possible, asserting it did not do anything.

G.M. waived her right to a jury trial, and the court held a court trial on the conservatorship petition on dates in March and then June 2023. A summary of the evidence presented follows.

---

[3]     G.M. appealed the initial conservatorship decision. A prior panel of this court concluded the trial court erred, and reversed and remanded for further proceedings. (*Conservatorship of G.M.* (B304894, Dec. 14, 2020) [nonpub. opn.].)

Prior to the conservatorship, G.M. had been in and out of mental health hospitals. The period of conservatorship was the longest time G.M. had consistently been taking medication. When G.M. was not on medication, she was combative and would start fights, both with strangers and with S.M. S.M. was G.M.'s payee for her Social Security benefits. G.M. had previously been banned from a Social Security office.

G.M. was living independently in a home with other people. She took her medication via a monthly injection, which she went to get herself every month. G.M. met with her psychiatrist once a month, her therapist once a week, and her social worker as needed. She enrolled herself in college and was able to drive. She had her own cell phone, which S.M. funded. S.M. ensured that G.M.'s housing was paid for and that G.M. had money for necessities. G.M. paid her own credit card bills and her gym membership bill.

From approximately September 2022 to a few days prior to trial, G.M. said she did not feel she needed medication, which she complained was causing side effects. When G.M.'s psychiatrist asked her to have blood work done, G.M. refused because she did not want to be diagnosed with another illness and required to take more medication. Days before the hearing, however, G.M. told S.M. she had changed her position on her medication.

During her testimony, G.M. admitted she has schizophrenia and was taking medication that helped manage her symptoms. She maintained she would continue taking her medication if the conservatorship terminated. She also stated she would continue seeing her psychiatrist, therapist, and social worker. G.M. said her circumstances were different than they had been in 2019 because she had been stable for the preceding

three years.  She said she had changed her mind about her medication and would continue taking it if released from her conservatorship.  She asserted her Social Security checks could go directly to her if the conservatorship were terminated.

Doctor Greg Baringoldz (Dr. Baringoldz), an expert in the field of psychology who prepared for the hearing by reviewing available records and speaking with G.M. and S.M. over the telephone, also testified at trial and opined G.M. suffers from schizophrenia.  When Dr. Baringoldz interviewed G.M., she would not say whether she needed treatment or medication for her schizophrenia, though she stated she would attend ongoing psychotherapy or continue taking medication.  Dr. Baringoldz opined there was a very strong connection between G.M.'s schizophrenia and her ability to take care of her basic necessities of life.  He did not believe G.M. would be able to obtain basic necessities of life if she was not under conservatorship and did not take her medication.  Dr. Baringoldz further opined G.M. was gravely disabled and did not have a workable understanding of her underlying mental health illness.  He believed she was taking her medication and cooperating so she could get out of the conservatorship, and he was not confident she would continue taking it if she were released from the conservatorship.

Based on the aforementioned evidence, the court stated it was impressed with how G.M. was living her life but also concerned about G.M.'s presentation in court, which it described as "pressured."  The court also expressed concern with G.M.'s paranoia about blood draws, which were for her safety and to ensure her medication wasn't harming her.  The court deferred deciding the conservatorship petition for two months, stating it

would decide the issue after hearing any further evidence that developed.

At the reconvened trial in June, S.M. testified that since the last court hearing, G.M. consented to have bloodwork done. She had been diagnosed with vasculitis and diabetes, and had a heart attack. G.M.'s doctors would not speak to S.M. without the conservatorship, and S.M. would not be able to help G.M. without it.

According to S.M., G.M. had been very resistant to self-care for medical treatment over the prior months and had delayed seeking medical intervention for her health problems. Specifically, G.M. had initially refused to see a doctor after developing a rash on her legs. Once they went to a doctor, they discovered she had an infection. The day she had a heart attack, she thought she had heartburn and S.M. had to convince her to go to the ER. S.M. believed that if she had not had the conservatorship to deal with medical treatments over the prior two months, G.M. would not be thriving.

G.M. testified that when she has medical problems she knows how to reach out and get help. For example, she had reached out to S.M. the night of her heart attack when she had difficulty breathing. G.M. listens to what the doctors say and takes the medication they prescribe her. G.M. believed she could care for herself if the conservatorship ended and S.M. did not help her. She was still taking medicine for her mental health and she believed she could make the right decisions for herself. G.M. said she had her own office in her home, was doing well in school, drove herself, was able to get food, could be her own social security payee, could buy her own clothes, and did not need S.M.'s help for food, clothing, or shelter. G.M. did not believe she

needed to lose her independence to get the help S.M. was giving her, which she described as making phone calls, talking to the insurance company, and talking to doctors.  G.M. said that if S.M. stopped helping her, she would do those things herself.

After the presentation of evidence, the court heard argument by counsel.  G.M.'s attorney argued the grave disability determination the court must make was limited to determining whether she could provide for her own food, clothing, and shelter.  She strenuously objected to the court's consideration of the ability for self-care.

The trial court disagreed.  It observed that "intrinsic within grave disability is the ability of self-care. . . . It's not just an isolated food, clothing, or shelter.  It's an issue of whether or not a mental illness effects an ability to provide proper judgment in self-care."  The court found that but for the conservatorship, G.M.'s "self-care suffers[,]" and "her ability to provide for herself in a healthy fashion suffers."  The trial court also opined the conservatorship provides G.M. stability, back up, and healthcare, and that "health care is intrinsic within an individual's ability not to be gravely disabled."  The court said it had "heard ample testimony that [G.M.] is ultimately resistant to being able to provide her own self-care, to recognize that she is in need of help."  The court ruled that this "inability to plan, to be able to provide for that is what I think makes [G.M.] still gravely disabled."[4]

_____

[4]     The court further remarked, "The prior testimony combined with the testimony today that her lack of recognition of physical ailments and her resistance of going to the doctor and using her conservator to help her with her physical ailments, because she is so opposed to that, that lack of judgment and connection there,

7

Having found G.M. remained gravely disabled as the result of a mental disorder, the trial court sustained the conservatorship petition and reappointed S.M. as conservator. The conservatorship termination date was January 29, 2024. The court stated that if G.M. came back and demonstrated she understood her medical needs and the consequences of not following doctor's orders, and was able to care for her medical needs, the court would terminate the conservatorship early.

G.M. noticed an appeal from the trial court's ruling on June 15, 2023, which was received in this court only later on September 14, 2023. (The record does not reveal the reason for the delay.) The opening brief was not filed until April 2024, and all parties agree the conservatorship was not extended past the January 29, 2024, termination date.

## II.  DISCUSSION

G.M.'s appeal is moot because the conservatorship at issue terminated and we can grant her no effective relief. She nonetheless asks us to decide whether it was proper for the court to consider her ability for self-care and her health when determining whether she was able to provide for her "basic

---

that is what I am primarily focused on . . . . [¶] . . . [¶]  My underlying basic concern boils down to that self-care argument and the judgment or lack thereof that she demonstrates in her own self-care.  If I'm wrong about that necessarily being included in an L.P.S. conservatorship isolated to food, clothing, or shelter, then I'm wrong.  I will be overturned.  [¶] . . . [¶]  My concern is her health and well-being which seems to be a part of her underlying mental illness . . . that effects her ability to care for herself."

8

personal needs for food, clothing, or shelter" (former section 5008, subdivision (h)(1)(A)) because, she says, it is a matter of general public interest that is capable of repetition but escaping review. That argument might have some force but for the fact that the Legislature has already, and recently, spoken to this exact issue and amended the pertinent statutory subdivision (section 5008, subdivision (h)(1)(A)) to clarify courts can consider precisely those issues (self-care and health care) that the trial court here considered when making a gravely disabled determination. Though that statutory amendment will not be implemented until 2026, we believe its enactment meaningfully undermines any interest the public may have on our expression of a view on the issue this appeal presents. We therefore opt not to exercise our discretion to address the issue and instead dismiss the appeal as moot.

### A.    *The LPS Act*

As relevant here, the LPS Act authorizes one-year conservatorships for those who are gravely disabled due to a mental health disorder. (§ 5350). "When a treatment professional determines a person is gravely disabled and unwilling or unable to accept treatment voluntarily, the county's public guardian may petition to establish a conservatorship. [Citations.] If the matter proceeds to trial and the person is found gravely disabled, the court appoints a conservator [citation], imposes 'disabilities' as needed [citation], and determines an appropriate treatment placement [Citation]. [Citation.] A conservatorship terminates after one year but may be extended for additional one-year terms upon petition.

9

[Citation.]" (*Conservatorship of Eric B.* (2022) 12 Cal.5th 1085, 1095-1096.)

At the time of G.M.'s trial, former section 5008, subdivision (h)(1)(A) defined "gravely disabled" as "[a] condition in which a person, as a result of a mental health disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter." More recently, however, the Legislature amended the statutory subdivision to authorize courts making a gravely disabled determination to consider a proposed conservatee's inability to provide for their "personal safety[ ] or necessary medical care" in addition to the food, clothing, or shelter considerations identified in the former version of the statute.[5] (§ 5008, subd. (h)(1)(A); see also Stats 2023, ch. 637, § 2.) This amendment to the statute took effect on January 1, 2024, but it has not yet been implemented in Los Angeles County because the Legislature permitted "[a] county, by adoption of a resolution of its governing body [to] elect to defer implementation of the changes made to this section . . . until January 1, 2026." (§ 5008, subd. (h)(4).) The Los Angeles County Board of Supervisors voted to defer implementation to that date.[6]

---

[5]     As we have seen, consideration of an ability to provide for personal safety and necessary medical care is precisely what the court here considered in extending G.M.'s conservatorship.

[6]     In addition to broadening the aforementioned considerations a court may consider when determining whether a proposed conservatee is able to provide for their basic personal needs, the amendment to section 5008, subdivision (h)(1)(A) also substantially expanded the grounds on which a conservatorship may be sought by adding the existence of a severe substance use disorder as a predicate for petitioning for a conservatorship.

*B.      Dismissal of the Appeal as Moot Is Warranted*

If a conservatorship terminates before an appeal is decided, the appeal becomes moot because a reversal of the appealed order would afford G.M. no effective relief.  (*Conservatorship of K.Y.* (2024) 100 Cal.App.5th 985, 988; *Conservatorship of J.Y.* (2020) 49 Cal.App.5th 220, 225.)  That is the case here.[7]

G.M. argues we should nevertheless address the moot issue she presents: whether the trial court could make a grave disability finding relying on self-care and health care considerations amended section 5008, subdivision (h)(1)(A) now clearly authorizes.  She argues we should exercise our discretion to decide this issue—even though a decision in her favor would have no practical effect on her—because the propriety of the trial court's interpretation of the statutory gravely disabled standard

---

(Previously, only the existence of a mental health disorder could serve as such a predicate.)

[7]      We reject G.M.'s argument that her appeal is not moot because of "collateral consequences" flowing from the sustained conservatorship petition—chiefly, an asserted "stigma."  In this case, G.M. has previously been placed under conservatorship (and, insofar as the record reveals, did not substantively contest some of those prior conservatorships) and the record does not indicate the additional period of conservatorship imposed following the bench trial at issue here created any additional stigma.  In addition, each petition for reappointment of a conservator under the LPS Act is resolved independently of any conservatorship that preceded it (see § 5361; *Conservatorship of Ben C.* (2007) 40 Cal.4th 529, 543), so the result in this case can have no material impact on any future conservatorship proceedings that might involve G.M.

is an issue "of general interest and likely to reappear in the future." (*Conservatorship of Manton* (1985) 39 Cal.3d 645, 647; see also *California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 933 [exercising discretion to decide a moot case because "it nonetheless presents important questions of continuing public interest that may evade review"].)

Under present circumstances, we do not believe there is an issue of public interest warranting an exercise of our discretion to decide a moot issue. The Legislature has already resolved the legal issue this appeal presents. That the Legislature's resolution has been deferred for a short time in Los Angeles County is not sufficient reason to decide the moot issue—particularly where the practical effect of such a decision would be very short lived and the Legislature's amendment of section 5008, subdivision (h)(1)(A) tends to reveal an intention for courts to construe sensibly and generously the considerations bearing upon whether a person is gravely disabled. (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 43 (2023-2024 Reg. Sess.) as amended June 30, 2023, at 16-17 [discussing the recommendation to amend the definition of "gravely disabled" and quoting a bill comment observing the former definition had been "stringently interpreted"].)

DISPOSITION

The appeal is dismissed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, Acting P. J.

We concur:



MOOR, J.



KIM (D.), J.