Filed 12/15/25

# CERTIFIED FOR PARTIAL PUBLICATION*/

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
SECOND APPELLATE DISTRICT
DIVISION FOUR

| | |
|---|---|
| HOWARD JARVIS TAXPAYERS ASSOCIATION, et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF LOS ANGELES, et al. <br><br> Defendants and Respondents. | B334071 <br><br> (Los Angeles County Super. Ct. Nos. 22STCV39662, 23STCV00352) |

APPEAL from an order of the Superior Court of Los Angeles County, Barbara M. Scheper, Judge. Affirmed.

Howard Jarvis Taxpayers Foundation, Jonathan M. Coupal, Timothy A. Bittle, Laura E. Dougherty, and Amy C. Sparrow for Plaintiffs and Appellants Howard Jarvis Taxpayers Association and Apartment Association of Greater Los Angeles.

Law Offices of Keith M. Fromm, Keith M. Fromm for Plaintiff and Appellant Jonathan Benabou, as Trustee on Behalf of the Mani Benabou Family Trust.

---

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of part II of the Discussion.

Bell, McAndrews & Hiltachk, Thomas W. Hiltachk, Brian T. Hildreth, Katherine C. Jenkins, and Logan W. Bambino for California Association of Realtors as Amicus Curiae on behalf of Appellant Howard Jarvis Taxpayers Association.

Burke, Williams, & Sorensen, Kevin D. Siegel, J. Leah Castella, and Eileen L. Ollivier for Defendant and Respondent City of Los Angeles.

Collins + Collins, Brian K. Stewart and Nicholas R. Colletti for Defendants and Respondents County of Los Angeles and County of Los Angeles Recorder's Office.

Irell & Manella, Morgan Chu, Michael Ermer, Charlotte J. Wen, Connor He-Schaefer, Nick Wagner, Woongki Park, and Taylor A. Hatridge; Public Counsel, Gregory Bonett, Faizah Malik, and Jonathan Jager for Defendants and Respondents Southern California Association of Non-Profit Housing, Inc., Korean Immigrant Workers Advocates of Southern California dba Koreatown Immigrant Workers Alliance, and Service Employees International Union Local 2015.

Under the California Constitution, the people retain the power to enact special real property transaction taxes by local initiative. (Cal. Const., art. II, §§ 1, 11; art. IV, § 1.) The main issue in this case is whether the people revoked this power when they adopted section 450(a) of the Los Angeles City Charter (section 450(a).) We hold that the people did not do so.

In the November 2022 General Municipal Election, voters in the City of Los Angeles approved "Initiative Ordinance ULA" (Measure ULA). Measure ULA authorizes an additional tax on the sale or transfer of real property exceeding $5 million. The revenue from the special transaction tax[1] is allocated to various housing and homelessness-related programs administered by the Los Angeles Housing Department.

Plaintiffs and appellants Howard Jarvis Taxpayers Association and Apartment Association of Greater Los Angeles (collectively, Howard Jarvis), and Jonathan Benabou, Trustee of the Mani Benabou Family Trust (Benabou) appeal from the trial court's order dismissing their complaints alleging that Measure ULA is invalid.

Howard Jarvis principally contends that Measure ULA is invalid because it conflicts with section 450(a). Section 450(a) provides, in part, that "[a]ny proposed ordinance *which the Council itself might adopt* may be submitted to the Council . . . requesting that the ordinance be adopted by the Council or be submitted to a vote of the electors of the City." (Italics added.) It is undisputed that charter cities may impose general transaction taxes, but under article XIII A, section 4 of

---

[1] A special tax is a tax imposed for a specific purpose. (*City and County of San Francisco v. Farrell* (1982) 32 Cal.3d 47, 58; Cal. Const., art. XIII C, § 1, subdivision (d).)

the state Constitution (section 4), they are prohibited from imposing real property special transaction taxes such as Measure ULA.[2]  (See *Fielder v. City of Los Angeles* (1993) 14 Cal.App.4th 137, 142 (*Fielder*).)  Relying on the italicized language in section 450(a), Howard Jarvis argues that because the City Council could not itself have enacted Measure ULA, voters cannot enact Measure ULA either.

In the published portion of this opinion, we conclude the passage of Measure ULA pursuant to a majority vote of the City's electorate was a valid exercise of the people's initiative power. While section 4 restricts *a local government's* ability to impose a special transaction tax, it does not limit the ability of *voters* to do so via initiative.  (*City and County of San Francisco v. All Persons Interested in the Matter of Proposition C* (2020) 51 Cal.App.5th 703, 721 (*Proposition C*).)  Howard Jarvis attempts to circumvent section 4's limited scope by arguing that section 450(a) revokes the people's reserved initiative power with respect to special transaction taxes.  We reject this argument.  When read in context and through the lens of well-established principles interpreting the people's power of initiative, section 450(a) does not invalidate Measure ULA.

In the unpublished portion of this opinion, we address Benabou's challenges to Measure ULA on constitutional grounds, including that it violates the Fourteenth Amendment's Equal Protection Clause and the First Amendment, and various other

---

[2]     Section 4 provides: "Cities, Counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district."

4

grounds including alleged misrepresentations in the ballot materials, preemption, and purported factual issues that preclude judgment on the pleadings. We conclude that none of Benabou's contentions has merit.

## BACKGROUND

Measure ULA was proposed on May 2, 2022, through the voter initiative procedure in Los Angeles. It was placed on the ballot at the General Municipal Election on November 8, 2022, where it passed with 57.77% of the vote.

On December 21, 2022, Howard Jarvis filed a reverse validation action against the City of Los Angeles (the City) pursuant to the validation statutes (see Gov, Code, § 50077.5; Code Civ. Proc., §§ 860-870.5) challenging Measure ULA under the Los Angeles City Charter and section 4. Benabou filed a separate reverse validation action against the City, the County of Los Angeles, and the County of Los Angeles Recorder's Office, challenging Measure ULA under 16 additional causes of action. The court consolidated the two cases.

The City answered both complaints, defending the validity of Measure ULA. Southern California of Association of Non-Profit Housing, Inc., Korean Immigrant Workers Advocates of Southern California dba Koreatown Immigrant Workers Alliance, and Service Employees International Union Local 2015, on behalf of All Persons Interested in the Matter of Measure ULA, also answered the complaints.

The parties filed cross-motions for judgment on the pleadings. After a hearing on the motions, the trial court granted judgment on the pleadings in favor of defendants, and entered an order of dismissal. Howard Jarvis and Benabou appeal from the dismissal order.

5

## DISCUSSION

**I.  Neither Section 450(a) Nor Section 4 Revoke the People's Initiative Power with Respect to Special Real Property Transaction Taxes**

The people's initiative power is both statewide and local. (Cal. Const., art. II, §§ 8, 11.)  Charter cities such as Los Angeles regulate their own initiative procedures.  (*San Diego Public Library Foundation v. Fuentes* (2025) 111 Cal.App.5th 711, 722, citing Cal. Const., art. XI, §§ 2, 3, & 5, subd. (a).)

The California Constitution speaks of the initiative power not as a right granted to the people, but as a power "the people reserve to themselves."  (Cal. Const., art. IV, § 1; see *Dwyer v. City Council of Berkely* (1927) 200 Cal. 505, 513 ["the legislative power of a municipality resides in the people thereof" and is "conferred" upon representatives].)  Our Supreme Court has described the initiative power as " 'one of the most precious rights of our democratic process.' "  (*Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 591 (*Livermore*).)

To preserve this precious right retained by the people, the courts liberally construe constitutional and charter provisions in favor of the initiative power.  (*California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 934 (*Upland*); *Livermore, supra*, 18 Cal.3d at p. 591; *DeVita v. County of Napa* (1995) 9 Cal.4th 763, 776 (*DeVita*).)  This means we are obligated to "resolve doubts about the scope of the initiative power in its favor whenever possible" and "narrowly construe provisions that would burden or limit the exercise of that power[.]"  (*Upland,* at p. 936; accord *Rossi v. Brown* (1995) 9 Cal.4th 688, 695 (*Rossi*).)  There is a presumption that the initiative power is not constrained.

6

(*Upland,* at p. 947; *Kennedy Wholesale, Inc. v. State Bd. of Equalization* (1991) 53 Cal.3d 245, 249 (*Kennedy Wholesale*).)

Moreover, " 'the law shuns repeals by implication.' " (*Kennedy Wholesale, supra,* 53 Cal.3d at p. 249.)  Absent a "clear, unambiguous indication" that a provision was intended to constrain the people's initiative power, "we will not construe a provision as imposing such a limitation."  (*Upland, supra,* 3 Cal.5th at p. 931, citing *Kennedy Wholesale,* at p. 252.)  Howard Jarvis refers to this latter principle as the "clear statement" rule, and we shall do the same.

Because the initiative powers reserved by the people in the state Constitution are legislative powers (Cal. Const., art. IV, § 1), courts historically "have restricted the exercise of local initiative powers by drawing a distinction between legislative and administrative acts," confining the local initiative process to "the legislative orbit."  (*Pettye v. City and County of San Francisco* (2004) 118 Cal.App.4th 233, 240 (*Pettye*).)  In the context of determining whether a local initiative is a matter of statewide concern, this approach has been criticized by our Supreme Court as "awkward and confusing" and an "unnecessary fiction." (*Committee of Seven Thousand v. Superior Court* (1988) 45 Cal.3d 491, 511.)

Although a city charter may not restrict the power of initiative, it may provide for initiative power that is broader than the initiative power reserved in the Constitution.  (*Rossi, supra,* 9 Cal.4th at pp. 696, 704; see also *Newport Beach Fire and Police Protective League v. City Council of the City of Newport Beach* (1961) 189 Cal.App.2d 17, 21–22 [a city charter may not limit the initiative power, "although it may increase that power"].)  " '[A]s between the provisions of the Constitution and the provisions of a

7

city charter, those which reserve the greater or more extensive [initiative or] referendum power in the people will govern.' " (*Pettye*, *supra*, 118 Cal.App.4th at 240, quoting *Hunt v. Mayor & Council of Riverside* (1948) 31 Cal.2d 619.)

Turning to the present matter, Howard Jarvis initially took the position that section 4, which prohibits charter cities from imposing real property special transaction taxes, also bars voter initiatives regarding such taxes. At oral argument, however, Howard Jarvis conceded that section 4 does not apply to voter initiatives. Howard Jarvis argues that section 4 nevertheless implicitly operates through section 450(a) to limit the people's initiative power. Applying the principles described above, we reject that argument.

Nothing in the text of section 450(a) overcomes the presumption that the people's local initiative power is unconstrained with respect to special transaction taxes. Section 450(a) provides: "Any proposed ordinance which the Council itself might adopt may be submitted to the Council by a petition filed with the City Clerk, requesting that the ordinance be adopted by the Council or be submitted to a vote of the electors of the City." This language does not clearly and unambiguously revoke the people's initiative power on any municipal topic, including special transaction taxes. Indeed, section 450(a) does not refer to a transaction tax or section 4 or any limitation on the people's initiative power. If we were to adopt Howard Jarvis's interpretation of section 450(a), we would effectively be holding the initiative power was repealed by implication. This we cannot do.

Nor does Howard Jarvis point to anything in the legislative history of section 450(a) that evidences an intent to limit the

8

scope of the initiative power over taxation.  The language "which the Council itself might adopt" was added to the Charter in 1911, decades before the adoption of section 4 in 1978.  In 1925, the Charter was amended to expand the initiative power to include "[a]ny proposed ordinance, legislative, administrative or executive, which the Council itself might adopt."  In 1985, the Charter was amended again to remove the phrase "legislative, administrative, or executive[.]"  All we can glean from this history is that the electorate initially sought to make clear that municipal voters, like the City Council, may legislate on municipal subjects (i.e., cannot legislate on subjects preempted by the state).  In 1925, however, the electorate sought to broaden the initiative power to administrative and executive matters but later limited it again to legislative matters.  This history certainly does not evidence an *unambiguous* intent to constrain the electorate's expressly reserved power of initiative over subcategories of legislation (i.e., special transaction taxes).

In *Upland, supra*, 3 Cal.5th at p. 931, our Supreme Court examined whether an amendment to our Constitution, section XIII C, section 2, subdivision (b), limited the voters' power to raise taxes by statutory initiative and concluded it did not.  The court held that unless there was an unambiguous indication that section XIII C was intended to constrain the people's initiative power, such a limitation could not be inferred.  (*Upland*, at p. 931.)  Howard Jarvis argues that this clear statement rule discussed in *Upland* is limited to "procedural" rather than "substantive" provisions.  We do not construe *Upland* so narrowly.  Nowhere in *Upland* does our Supreme Court limit the scope of its holding to minimizing "procedural" barriers.

9

It is true that *Upland* recognized that " 'statutory and constitutional limits on the power of local government apply equally to local initiatives.' " (*Upland, supra*, 3 Cal.5th at p. 942.) As an example, *Upland* stated that when a local government lacks authority in an area due to state preemption, the local electorate also lacks that authority. (*Ibid.*) And *Upland* noted that these limitations do not apply to procedural requirements such as "notice and hearing requirements" or "two-thirds vote requirements." (*Ibid.*) But after reviewing case law on the limits of local initiative power, the court made clear its holding and the cases it reviewed rested on broader principles and the "presumption in favor of the initiative power." (*Upland, supra*, 3 Cal.5th at p. 943, citing *DeVita, supra*, 9 Cal.4th at pp. 785—786.)

As the *DeVita* court observed, the general rule that "statutory procedural requirements imposed on the local legislative body" do not "apply to the electorate nor are taken as evidence that the initiative . . . is barred" is merely "a corollary to the basic presumption in favor of the electorate's power of initiative." (*DeVita, supra*, 9 Cal.4th at p. 786.) That "basic presumption" applies against a finding that section 450(a) revoked the people's local initiative power. Howard Jarvis has not rebutted the presumption here.

Howard Jarvis alternatively argues there is a "co-extensive" rule that categorically and without exception limits local initiative power within the metes and bounds of the power of the local government in the same geographic area. Under this rule, Howard Jarvis contends, "even absent charter section 450(a), Measure ULA is void because the City Council cannot 'legislate in an area' of special [transaction] taxes and therefore

10

neither can the people." Howard Jarvis's argument rests on the premise that section 4 bars both local governments and local electorates from enacting special transaction taxes. But as Howard Jarvis now concedes, this premise is wrong because section 4 does not apply to voter initiatives.

This case presents an issue not directly addressed by prior cases. Section 4 has two clauses. The first clause provides that cities, counties, and special districts may impose "special taxes" only after obtaining approval "by two-thirds vote of qualified electors." The second clause provides that local government entities cannot impose ad valorem taxes on real property or a special "transaction tax or sales tax on the sale of real property within" their territory. Several cases have held that section 4's two-thirds requirement for imposing special taxes does not apply to voter initiatives. (See e.g., *Proposition C, supra*, 51 Cal.App.5th at p. 721; *City and County of San Francisco v. All Persons Interested In the Matter of Proposition G* (2021) 66 Cal.App.5th 1058, 1070; *Howard Jarvis Taxpayers Association v. City and County of San Francisco* (2021) 60 Cal.App.5th 227, 235.) But the parties have not cited and we have not found any cases that specifically address whether section 4's provision prohibiting special transaction taxes applies to voter initiatives.

The reasoning of the cases addressing section 4's first clause applies here. Under its plain text, section 4 applies only to "Cities, Counties and special districts." Section 4 states nothing about limiting the people's reserved initiative power to enact special transaction taxes. We conclude that section 4 did not impliedly revoke the local initiative power with respect to special real property transaction taxes.

11

*Kennedy Wholesale* is instructive. There, the issue was whether a proposition that increased the tax on tobacco products violated Article XIII A, section 3 of the California Constitution (section 3). Under section 3, "any changes in State taxes enacted for the purpose of increasing revenues . . . must be imposed by . . . *the Legislature*." (Italics added.) After acknowledging that section 3's plain meaning ostensibly granted the Legislature exclusive power to raise taxes, the court stated that section 3 "is ambiguous when read in the context of the whole Constitution." (*Kennedy Wholesale*, *supra*, 53 Cal.3d at p. 249.)

The court then analyzed whether section 3 impliedly revoked the people's initiative power to raise taxes. First, it noted that section 3 "does not even mention the initiative power, let alone purport to restrict it." (*Kennedy Wholesale*, *supra*, 53 Cal.3d at p. 249.) Next, the court noted that there is a presumption against an implied repeal of the people's initiative power, one of the most precious rights of the people of California. (*Ibid.*) Both points equally support our conclusion that section 4 did not impliedly revoke the people's local initiative power with respect to transaction taxes.

The *Kennedy Wholesale* court also reviewed the legislative history of section 3, which was enacted as part of Proposition 13. (*Kennedy Wholesale*, *supra*, 53 Cal.3d at p. 249.) The court explained nothing in Proposition 13's official ballot supported the inference that the voters intended to "limit their own power to raise taxes in the future by statutory initiative." (*Id* at p. 250.) "To the contrary," the court continued, "the arguments in favor of Proposition 13 adopt a populist theme that cannot easily be reconciled with plaintiff's interpretation of the measure. Proponents of Proposition 13 described the measure as directed

12

against 'spendthrift politicians' and as '[r]estor[ing] government of, for and by the people.' [Citation.] If, as the proponents' argument suggests, a preference for direct democracy over the legislative process played a role in motivating the passage of Proposition 13, the conclusion that the voters intended to limit their own power would be difficult to justify." (*Ibid*.)

The same is true here. Like section 3, section 4 was enacted pursuant to Proposition 13. (*Alliance San Diego v. City of San Diego* (2023) 94 Cal.App.5th 419, 430.) The legislative history of Proposition 13 is "inconsistent with the claim that voters intended Proposition 13 to limit their own power to raise taxes by initiative." (*Proposition C*, *supra*, 51 Cal.App.5th at p. 716 ["None of the evidence *Kennedy Wholesale* cites is specific to section 3, as distinct from section 4, of article XIII A"].) Because the voters did not generally intend for Proposition 13 to limit their own power to raise taxes by initiative, we will not read section 4—which applies to cities, counties, and special districts—as implicitly applying to the electorate's power of initiative.

We acknowledge that a local electorate's right to initiative is "generally co-extensive with the legislative power of the local governing body." (*DeVita*, *supra*, 9 Cal.4th at p. 775.) For example, a local initiative "could not be used in areas in which the local legislative body's discretion was largely preempted by statutory mandate." (*Id*. at p. 776.) This case, however, illustrates an exception to the general rule. As explained, we agree with Howard Jarvis that local government entities are precluded from imposing special real property transaction taxes, but the people are not so precluded by section 4. Howard Jarvis cannot circumvent this dichotomy through section 450(a) because

13

that section did not implicitly repeal the people's right to impose special real property transaction taxes by initiative.

## II. None of Benabou's Arguments Demonstrate Measure ULA is Invalid[3]

### A. Measure ULA Does Not Violate Equal Protection

Benabou argues that Measure ULA impinges on the "fundamental right" to dispose of property and that it fails strict scrutiny because "[c]learly an infinite number of alternative

---

[3] We note that the following discussion of Benabou's arguments is limited to those raised on appeal in his opening brief and supported by reasoned argument and citations to legal authority. (See *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852, fn. omitted ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as [forfeited]."].) We decline Benabou's improper requests to "read, in their entirety, the briefs and supporting materials filed by [Benabou] in the lower court, as they comprise very important components of the appellate record in this case" and to "independently read the whole of the [complaint] to assess whether it states valid causes or could be amended to do so, whether discussed in this brief or not." (See *Soukup v. Law Offices of Herbet Hafif* (2006) 39 Cal.4th 260, 294 fn. 20 [It is well settled that, on appeal, incorporation by reference of documents filed in the trial court is not permitted]; see also *Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99 ["Issues do not have a life of their own: if they are not raised or supported by argument or citation to authority, we consider the issues [forfeited]."].) We also deny Benabou's "Request to Deem Facts and Arguments Admitted, and Request to Grant Proposed Amendments."

14

means of raising money to remediate homelessness exist." We disagree. As discussed below, the rational basis test applies. Applying that standard, Measure ULA passes constitutional muster.

In equal protection challenges, "[c]lassifications that disadvantage a 'suspect class' or impinge upon the exercise of a 'fundamental right' are subject to strict scrutiny; this requires the state to demonstrate that its classification 'has been precisely tailored to serve a compelling government interest.' " (*Jensen v. Franchise Tax Bd.* (2009) 178 Cal.App.4th 426, 434 (*Jensen*).) Neither condition is met here.

Although not entirely clear, it appears that Benabou is arguing that wealth is a suspect class. Wealthy individuals do not, however, form a "suspect class." (See *Jensen, supra*, 178 Cal.App.4th at pp. 434—435.) Benabou provides no authority to the contrary.

Nor does Measure ULA impinge upon a fundamental right. Fundamental rights are those that are " ' "explicitly or implicitly secured by the Constitution." ' " (*Jensen, supra*, 178 Cal.App.4th at p. 434, fn. 3.) Benabou provides no authority for his assertion that the right to dispose of one's property is a fundamental right. Assuming this is a fundamental right, "not every limitation or incidental burden on a fundamental right is subject to the strict scrutiny standard." (*Fair Political Practices Comm'n v. Superior Court* (1979) 25 Cal.3d 33, 47 (*Fair Political Practices*).) "It is only when there exists a real and appreciable impact on, or a significant interference with the exercise of the fundamental right that the strict scrutiny doctrine will be applied." (*Ibid*.)

Benabou has not shown that Measure ULA imposes a significant interference with property rights. Benabou claims

15

that ULA's tax rates of 4% or 5.5% of the gross proceeds of the sale "may very well make it *impossible* for a property owner to even sell their property."  But he provides no support for this speculative statement.  (See *Doe v. Roman Catholic Archbishop of Los Angeles* (2016) 247 Cal.App4th 953, 960 ["We must accept as true all 'well-pleaded facts' in the complaint, but need not accept allegations containing . . . 'unsupported speculation' "].)  Benabou has not pointed us to—and we are unaware of—any cases holding that a real property transaction tax triggers strict scrutiny review.[4]  To the contrary, courts have consistently applied the rational basis standard to equal protection challenges to tax legislation.  (See e.g., *Kahn v. Shevin* (1974) 416 U.S. 351, 355 [rational basis standard applied to equal protection challenge to property tax exemption for widows, but not for widowers]; see also *Jensen, supra*, 178 Cal.App.4th at pp. 431, 437—440 [finding a rational basis for a tax on people earning over $1,000,000 to expand mental health services "for all Californians," even though the taxpayers had no "need or use for" the tax-funded mental health services and "most" of the beneficiaries fell within the tax exemption]; *Ashford Hospitality Advisors LLC v. City & County of San Francisco* (2021) 61 Cal.App.5th 498, 504 (*Ashford*) [upholding, under rational basis, a property "transfer tax

---

[4]     Benabou's reliance on *People v. Beach* (1983) 147 Cal.App.3d 612 (*Beach*) and *People v. Leon* (2010) 181 Cal.App.4th 943 (*Leon*) is unavailing.  The issue in those cases was whether probation conditions that impaired individuals' rights to associate with others, to travel, and to own property were valid.  (*Beach, supra*, at pp. 621—622; *Leon, supra*, at p. 951.)  Neither case involved an equal protection challenge to legislation; thus, they have no bearing on the standard of review here.

ordinance [that] sorts taxpayers into different classifications based on the gross value of the property sold and taxes them at differing rates according to their classification"].)  There is no basis for holding that a heightened degree of scrutiny is appropriate here.

Under the rational basis standard, a law " ' "must be upheld against equal protection challenge *if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." ' "  (*City & County of San Francisco v. Flying Dutchman Park* (2004) 122 Cal.App.4th 74, 83.)  Where there are plausible reasons for the classification, "our inquiry is at an end." (*Ibid*.)  Only a legislative classification that is "purely arbitrary and capricious and based upon no reasonable or substantial difference between classes" is unconstitutional. (*Ibid*.)

Benabou bears a "very heavy burden" of proving Measure ULA's classifications are so arbitrary that it violates equal protection.  (*Borikas v. Alameda Unified School District* (2013) 214 Cal.App.4th 135, 149.)  He has failed to meet that burden.

Relying on *Stewart Dry Goods Co. v. Lewis* (1935) 294 U.S. 550 (*Stewart Dry Goods*), Benabou contends that "any tax" based on gross amounts is inherently arbitrary.  This argument was soundly rejected by the court in *Ashford*.

The *Ashford* court upheld the tax before it as distinguishable from the tax in *Stewart Dry Goods*.  In *Stewart Dry Goods*, the court invalidated a graduated gross receipts tax imposed on the retail sale of merchandise under which the rate of tax increased as the total gross receipts of all sales increased. The statute taxed similar transactions differently depending on the amount of receipts obtained from previous transactions.

17

(*Stewart Dry Goods, supra*, 294 U.S. at pp. 553—554.)  The tax at issue in *Ashford,* similar to Measure ULA*,* applied tiered tax rates based on the value of the real property, with increased rates for higher-value properties.  (*Ashford, supra*, 61 Cal.App.5th at pp. 501—502.)  The *Ashford* court rejected an equal protection challenge to the tax ordinance, and distinguished it from the gross receipts tax in *Stewart Dry Goods*.  The *Ashford* court explained: "*Stewart Dry Goods* merely holds that classifying taxpayers, for the purpose of imposing a sales tax, based on gross sales of items other than the item being sold is arbitrary and irrational if the justification is the taxpayer's purported ability to pay."  (*Ashford,* at p. 506.)  The *Ashford* tax was constitutional because "[g]ross value [was] not used solely as a proxy for profit," and "the classifications [were] supported by practical considerations, including the amount of work required to process the transfer of higher valued property and the city's interest in fairly allocating the costs of servicing higher valued properties." (*Id*. at p. 505.)

So too here.  As the trial court observed, "[t]he classifications in Measure ULA are substantially the same as those in *Ashford* and are rationally supported for the same reasons."

Benabou's final arguments regarding Measure ULA's supposed arbitrariness—i.e., that a person who sells property for one dollar under the $5 million threshold will not pay the tax, and the tax applies to persons who sell properties for gross proceeds over $5 million even if they sell the property at a loss— are unpersuasive.  Equal protection " 'does not require . . . exact equality of taxation.  It only requires that the law imposing it shall operate on all alike, under the same circumstances.' "

18

(*Ashford, supra*, 61 Cal.App.5th at p. 507, quoting *Magoun v. Illinois Trust & Savings Bank* (1898) 170 U.S. 283 [explaining that, for example, equal protection is not violated just because an inheritance of $10,000 is taxed at 3% and an inheritance of $10,001 is taxed at 4%].)  Moreover, that Measure ULA's tax is imposed on all members of the stated class, irrespective of other factors (such as whether the property is sold at a loss), does not render it unequal.  In fact, it is just the opposite: Measure ULA's identical treatment of all members of each class demonstrates equal protection.

### B.     Measure ULA Does Not Violate the First Amendment

Benabou next contends Measure ULA violates constitutional free speech protections "because it imposes an unreasonable burden . . . on some property owners' rights to express themselves" through the written instruments used to record the transfer of real property subject to taxation.

"We must first consider whether [Measure ULA] implicates the First Amendment at all."  (*Midway Venture LLC v. County of San Diego* (2021) 60 Cal.App.5th 58, 84 (*Midway Venture*).)  Benabou bears this initial burden.  (*Ibid*.)  "[R]estrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct." (*Sorrell v. IMS Health Inc.* (2011) 564 U.S. 552, 567.)  "[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech."  (*Ibid*.)  While "[i]t is possible to find some kernel of expression in almost every activity a person undertakes, . . . such a kernel is not

19

sufficient to bring the activity within the protection of the First Amendment." (*City of Dallas v. Stanglin* (1989) 490 U.S. 19, 25.)

Benabou has not met his burden to demonstrate the First Amendment applies here. Measure ULA regulates economic activity, not speech. "It does not, on its face, limit what someone can or cannot communicate. Nor does it restrict when, where, or how someone can speak." (*American Society of Journalists and Authors, Inc. v. Bonta* (9th Cir. 2021) 15 F.4th 954, 961.) It instead imposes a tax on the sale of real property exceeding certain thresholds. That the amount of consideration paid for the property is recorded in a deed does not turn Measure ULA's tax into a regulation on expressive speech. Rather, as Benabou concedes, the tax imposed by Measure ULA is "based on 'gross proceeds' " of the sale of real property, rather than on the content of any recorded instrument related to that sale. Nothing in Measure ULA requires or forbids the inclusion of certain content in any deed, instrument, or writing.

Because Measure ULA regulates only the economic conduct of conveying real property rather than speech, it does not implicate the First Amendment. (See e.g. *Ohralik v. Ohio State Bar Ass'n* (1978) 436 U.S. 447 [citing numerous examples of communications that are regulated without offending the First Amendment].)

### C. Alleged Misrepresentations in the Ballot Materials Do Not Invalidate Measure ULA

For the first time on appeal, Benabou asserts that "the ULA ballot materials contained material misrepresentations," which constitutes a "substantial ground for invalidation." Benabou seeks leave to amend to include this new claim in an

amended complaint. But leave to amend should not be granted where—as here—amendment would be futile. (See e.g. *Vaillette v. Fireman's Fund Ins. Co.* (1993) 18 Cal.App.4th 680, 685.)

This belatedly asserted claim is untimely under the validation statutes. The statute of limitations for challenging the legality of Measure ULA lapsed more than two years ago. (See Code Civ. Proc., § 863 [reverse validation complaint must be filed within 60 days of the act to be challenged].) Allowing a new challenge to Measure ULA years after the statute of limitations have lapsed, which could have easily been alleged at the time of the original complaint, would defeat the purpose of the validation statutes. (See *Millbrae Sch. Dist. v. Superior Court* (1989) 209 Cal.App.3d 1494, 1497; *Friedland v. City of Long Beach* (1998) 62 Cal.App.4th 835, 843.) We therefore decline to remand the matter to allow Benabou's proposed amendment. (See e.g. *Royalty Carpet Mills, Inc. v. City of Irvine* (2005) 125 Cal.App.4th 1110, 1124 [denial of leave to amend complaint is appropriate where "amendment would be futile because the amended [complaint] would be barred by the statute of limitations"].)[5]

---

[5] We note the proposed amendment would be futile for the additional reason that it lacks merit. Benabou takes issue with the revenue projections in the ballot measure's financial impact statement but those projections were clearly identified as estimates that "will fluctuate." The other purportedly misleading statements Benabou identifies—calling Measure ULA a "mansion tax" and stating it would "affect only 'millionaires and billionaires' " were included in the section of the ballot materials providing arguments for and against the proposed measure. Those pages stated that the "[a]rguments printed on this page are the opinions of the authors and are not checked for accuracy by any City agency."

21

**D.     State Law Does Not Preempt Measure ULA**

Benabou contends Measure ULA is preempted by the Documentary Transfer Tax Act (Rev. & Tax. Code, § 11901 et seq.) (the DTT Act).  Again, we disagree.

The DTT Act authorizes local jurisdictions to adopt ordinances taxing the transfer of real property at specified rates. (*CIM Urban REIT 211 Main St. (SF), LP v. City and County of San Francisco* (2022) 75 Cal.App.5th 939, 949 (*CIM*).)  However, article XI, section 5, subdivision (a) of the state Constitution gives "charter cities 'home rule' power to legislate their own municipal affairs."  (*CIM,* at p. 949.)

Under the home rule doctrine, " '[c]harter cities are specifically authorized by our state Constitution to govern themselves, free of state legislative intrusion, as to those matters deemed municipal affairs.' "  (*CIM, supra,* 75 Cal.App.5th at pp. 949–950 .)  "Generally, local tax ordinances are deemed to address municipal affairs."  (*Id.* at p. 950.)  Voters adopted Measure ULA by relying on its charter city "home rule" power, rather than the DTT Act, as its authority for the transaction tax.

Only when "a local measure is in actual conflict with a state law, and the subject of the state law is a matter of statewide concern and the state statute is not overbroad, the conflicting local law must cede to the state law."  (*CIM, supra,* 75 Cal.App.5th at p. 950; see also *Fielder, supra*, 14 Cal.App.4th at p. 143 [" 'In the event of a true conflict between a state statute reasonably tailored to the resolution of a subject of statewide concern and a charter city tax measure, the latter ceases to be a "municipal affair" to the extent of the conflict and must yield.' "].)

Benabou lists several purported conflicts between the DDT Act and Measure ULA.  But even if a conflict existed, Measure

22

ULA overrides conflicting state law under the home rule doctrine because "imposition of a local transfer tax is a municipal affair that does not implicate significant state interests." (*CIM, supra*, 75 Cal.App.5th at 956; see also *California Fed. Savings & Loan Assn.* v. City of Los Angeles (1991) 54 Cal.3d 1, 13 [levying taxes is a municipal affair under the home rule doctrine].) Indeed, "section 2 of the [DTT Act], which was not codified . . . recognizes that . . . charter cities have authority under the home rule doctrine to impose transfer taxes that do not conform to [the DTT Act]."[6] (*CIM,* at p. 957.) Accordingly, because the "subject of property taxes is not one of statewide concern, it is a municipal affair which lies "beyond the reach of legislative enactment"" in the case of charter cities." (*Fielder, supra*, 14 Cal.App.4th at p. 146.)[7]

### E.  There Are No Material Factual Issues That Preclude Judgment on the Pleadings

On appeal, Benabou identifies two issues that he claims cannot be resolved as a matter of law and that necessitate evidentiary findings: (1) his allegation that Measure ULA was motivated by class animus; and (2) his allegations that Measure ULA violates the Equal Protection Clause. We disagree.

---

[6] "It is well established that . . . an uncodified section of legislation *may* be used to ascertain legislative intent." (*CIM, supra,* 75 Cal.App.5th at p. 959.)

[7] Benabou does not challenge the application of the home rule doctrine on appeal, and has thus forfeited this issue.

As to the issue of animus, Benabou alleged generally in his complaint that defendants were "motivated by improper animus, comprising 'class warfare' against . . . 'millionaires and billionaires.' "  The allegations of animus were included under the complaint's eleventh "cause of action" in which Benabou sought a writ of mandate directing defendants to, among other things, "cease and desist in the collection and enforcement of the ULA tax" and "restore to [p]laintiffs any and all moneys that have been unlawfully and/or improperly collected as ULA taxes."

Animus is not an element of any of Benabou's causes of action, let alone his request for a writ of mandate.  A material fact that would prelude judgment on the pleadings, however, "must relate to some claim or defense in issue under the pleadings, and it must also be essential to the judgment in some way." (*Riverside County Community Facilities Dist. No. 87-1 v. Bainbridge 17* (1999) 77 Cal.App.4th 644, 653.)  Whether the Los Angeles electorate engaged in "class warfare" has no bearing on any of Benabou's claims.

We likewise reject Benabou's contention that his Equal Protection claim presents factual questions precluding judgment on the pleadings.  As discussed above, Benabou's Equal Protection claim is subject to rational basis review.  "Whether a statute or regulation is rational is, as a general rule, a legal question for the courts to resolve, not a factual question requiring an evidentiary hearing.  In conducting a rational-basis equal protection analysis, ' "a legislative choice is not subject to courtroom factfinding and may be based on rational speculation *unsupported by evidence or empirical data*." ' "  (*In re Jenkins* (2010) 50 Cal.4th 1167, 1181, original italics.)

## F. Trial Court Did Not Abuse its Discretion by Denying Leave to Amend

Leave to amend may be granted on appeal if there is a reasonable possibility that the complaint's defects can be cured by amendment. (*Zelig v. County. of Los Angeles* (2002) 27 Cal.4th 1112, 1126.) " 'The burden of proving such reasonable possibility is squarely on the plaintiff.' " (*Ibid.*)

Benabou falls woefully short of carrying his burden. Instead, he simply attempts to shift his burden to this court by claiming we should "grant leave to amend, *sua sponte*, regardless of whether such claims were discussed in this [b]rief." We decline to do so. (See e.g. *Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350, 1371—1372 [rejecting appellant's argument that if the appellate court deems any claim inadequately pled, it should grant him to leave to amend, explaining " '[t]he reviewing court is not required to make an independent, unassisted study in search of error or grounds to support the judgment.' "].) Because Benabou has failed to identify any allegations he could add that might support a viable cause of action, we deny his request for leave to amend his complaint.

## G. Benabou's Request for Judicial Notice of Post-Judgment and Post-Election Publications

Benabou requests that we take judicial notice of certain post-judgment and post-election publications whose authors contend Measure ULA has not been effective and has had unintended consequences. Contrary to Benabou's assertions, however, these documents are irrelevant to the issues on appeal. Benabou claims that these documents show that Measure ULA has reduced housing production and created fiscal drains that

undermine the stated legislative purpose of the initiative. But under rational basis review, we look only at whether there are plausible reasons for the classifications in the law, not whether the stated legislative purpose was ultimately achieved. (*City & County of San Francisco v. Flying Dutchman Park* (2004) 122 Cal.App.4th 74, 83.) The documents also do not demonstrate that the ballot materials were misleading *at the time of the election*. We therefore decline to take judicial notice of the post-judgment and post-election documents. (See *Hayward Area Planning Assn. v. City of Hayward* (2005) 128 Cal.App.4th 176, 182 ["Only relevant material is a proper subject of judicial notice"].)

## DISPOSITION

The order of dismissal is affirmed.  Respondents are awarded their costs on appeal.

## CERTIFIED FOR PARTIAL PUBLICATION

TAMZARIAN, J.

We concur:


MORI, Acting P.J.


VAN ROOYEN, J.*

---

   \*     Judge of the San Luis Obispo Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.